**GOVERNMENT OF the VIRGIN ISLANDS**

v.

**ZEPP, Jo-Ann.**

**Appeal of Jo Ann ZEPP.**

**No. 83–3201.**

United States Court of Appeals, Third Circuit.

Argued April 23, 1984.

Decided Nov. 13, 1984.

Garth, Circuit Judge, filed concurring opinion.

Judd C. Iversen, P.C. (argued), Michael T. Citara, San Francisco, Cal., for appellant.

James W. Diehm, U.S. Atty., Douglas L. Capdeville, Asst. U.S. Atty. (argued), Christiansted, St. Croix, V.I., for appellee.

Before SEITZ, Chief Judge, GARTH and HIGGINBOTHAM, Circuit Judges.

## OPINION OF THE COURT

A. LEON HIGGINBOTHAM, Jr., Circuit Judge.

Defendant Jo Ann Zepp appeals from a judgment and conviction for destruction of evidence in violation of 14 V.I.C. § 1506, simple possession of a controlled substance in violation of 19 V.I.C. § 607 and from the denial of her motion for a new trial. Following a jury trial,[1] she was sentenced to one-year imprisonment on the destruction

1. This appeal is related to the appeal of the Government of the Virgin Islands v. Glenn Williams, No. 83–3189. Williams and Zepp were co-defendants and tried jointly.

2. Zepp raises three additional contentions. First, she alleges that certain evidence seized during the narcotics raid conducted at the dwelling she shared with Williams should have been suppressed along with pertinent testimony by narcotics agents. Second, she maintains that her presence during certain drug transactions was not sufficient to support a finding of her guilt. Finally, the defendant claims that the denial of her motion for a new trial was an abuse of discretion in light of the trial court's

of evidence count and fined $5,000.00 on the simple possession count.

This appeal challenges, *inter alia*, the constitutionality of the trial proceedings below.[2] Specifically, the defendant asserts that her sixth amendment right to effective assistance of counsel was violated because trial counsel had an actual conflict of interest due to (1) his potential liability for the same charges on which she was tried and (2) the fact that he was a witness for the prosecution. Thus, the defendant challenges the failure of counsel to withdraw from representation and also questions the propriety of the trial judge's failure either to disqualify trial counsel or to obtain a knowing waiver of effective assistance of counsel.

We reverse the judgment and conviction and remand the matter with directions to grant a new trial.

### I.

Jo Ann Zepp ("Zepp") was placed under arrest on December 18, 1982 following a "raid" on 38 Estate Little Fountain, property which Zepp owned since 1978 and where she resided with co-defendant Glenn Williams ("Williams"). The raid conducted by three officers from the Department of Public Safety (DPS) and four Narcotics Strike Force (NSF) agents was the culmination of an undercover operation and investigation in St. Croix which began in early December of 1982 for the purpose of infiltrating drug and stolen property rings.[3]

On December 18, 1982, at approximately 7:30 a.m., narcotics agents arrived at 38

erroneous finding regarding whether a government agent perjured himself.

We will not address the defendant's first two arguments because we find them to be without merit. As to her final point, we are of the opinion that it is rendered irrelevant in view of our holding.

3. According to the government's evidence, the series of events leading to Zepp's arrest actually began on December 8, 1982 when narcotics agents first became acquainted with one Jose Parrilla, a/k/a Cheo ("Parrilla") who indicated that he could introduce them to certain persons from whom they could purchase drugs. On December 11, 1982, Parrilla directed the under-

Estate Little Fountain to arrest Williams on drug-related charges, without warrants. The armed officers surrounded the house with a canine unit. David Sibilly, the agent-in-charge, testified that he was positioned near the front door. He also testified that he identified himself, asked the occupants to open the door, and heard a female voice respond, "I'm coming." Shortly thereafter, Sibilly again called for the occupants to come out. He further testified that "suddenly" the toilets in bathrooms on opposite ends of the house were heard flushing simultaneously. The agents waited and the door was finally opened by Zepp. Williams, standing in the doorway, was arrested immediately.

The agents conducted a sweep search of the premises for safety reasons but the results were negative. Williams was then taken to police headquarters, during which time Zepp's attorney, Jack James ("James") arrived at 38 Estate Little Fountain. Zepp and James then entered the residence and closed the front door. According to testimony at trial, moments later police officers heard a toilet flush several times. Within one hour after James' arrival, Zepp was arrested by agents at the direction of an Assistant United States Attorney.

A search warrant for the house was later obtained and executed on the same day, but only one small plastic bag was discovered and it tested negative for cocaine. On December 21, 1982, a search warrant for the septic tank connected to the house was executed. The search produced 40 triangular-shaped plastic bags, 20 of which tested positive for cocaine residue.

A suppression hearing was conducted on January 26, 1983. The government informed the trial judge that it intended to call Jack James, Zepp's attorney, as a government witness. James objected. The trial judge stated that it was not necessary to rule on defense counsel's objection until he was actually called.[4] At the suppression hearing, while representing his client, James was called as a prosecution witness. He requested a proffer whereupon the government stated that there was a question as to whether or not he had occasion, while in the house with Zepp, to use the bathroom. James objected on the ground of relevancy and on the ground that if called upon to be a witness, it would jeopardize his position as defense counsel.[5] The parties ultimately agreed to a stipulation wherein James stated that at no time when

cover narcotics agents to a residence, later identified as 38 Estate Little Fountain, where a white female, later identified as Zepp, came to the door of the house. A black male, later identified as Glenn Williams, a/k/a Dugo/Indugo, gave Parrilla a small triangular-shaped glassine bag containing a substance, later identified as cocaine, in exchange for $300.00.

A second cocaine purchase was made on December 15, 1982 at 38 Estate Little Fountain. An agent saw the same white female he had seen earlier on December 11, 1982 walking inside the house. He also saw Williams give Parrilla a triangular-shaped, clear glassine envelope containing a substance later tested positive for cocaine.

On December 17, 1982, the undercover agents discovered that their "safe" house or base of operation had been burglarized. Stolen in that burglary were the true identifications of the undercover agents, police reports and a weapon. The agents unsuccessfully went in search of a suspect. At approximately 10:30 p.m., agents attempted to locate local and federal magistrates in order to obtain warrants for the search of the premises at 38 Estate Little Fountain and

for the arrest of Williams. At approximately 11:00 p.m., an Assistant United States Attorney advised the agents to wait until the following morning to obtain warrants. The agents decided to proceed.

4. ATTORNEY CAPDEVILLE: We also intend to call Attorney Jack James as a government witness.
   THE COURT: Has he been notified? All right.
   ATTORNEY JAMES: I also was notified, and I greatly remonstrated with him, and I do object.
   ATTORNEY CAPDEVILLE: Your Honor, if I may—just talk about that for a second—
   THE COURT: I don't think we have to talk about it unless you actually call him. All right.
   Appendix ("App.") at 110.

5. ATTORNEY CAPDEVILLE: I call Attorney Jack James, sir.
   THE COURT: Would you like to—
   ATTORNEY JAMES: I would like to hear a proffer.
   ATTORNEY CAPDEVILLE: We intend to ask several questions as to whether or not Mr.

he was in the house were any of the bathrooms used by him.[6]

The stipulation entered into by defense counsel at the suppression hearing was introduced into evidence at trial.[7] At trial, the judge made the following statement to the jury:

THE COURT: Ladies and gentlemen of the jury, the parties have entered into a stipulation, and a stipulation is an agreement by the parties that in this particular instance, if Attorney John F. James were called as a witness and sworn, that *he would testify that during the period of time that he was in the premises at 38 Estate Little Fountain on December 18th, 1982, he did not flush any toilets, that he did not personally flush any toilets.*

Is that a correct statement of the stipulation, Mr. James?

---

James, when he went into the house with the association of Miss Zepp ... whether or not he had occasion within two to three minutes to use the bathroom on the right side of the house. That goes nothing into the confidentiality of anything that was said.

THE COURT: Those are the sole questions you intend to ask?

ATTORNEY CAPDEVILLE: Yes, Your Honor.

THE COURT: Mr. James?

ATTORNEY JAMES: Your Honor, I fail to see the relevancy of it; and, secondly, I think it places my position as defense counsel in jeopardy if I'm called upon to testify in a case and, as a result of that testimony, if the court should rule that this case should just go forward, there was going to be publicity that was already that causes slur upon me and my client. I told Mr. Capdeville from the very outset; and, secondly, in his brief he said between two and seven minutes, and I'll put it this way:

If I am forced to go to the stand, I want it with the explicit situation [sic] that I will not be barred from participating when the case is held, but I'll ask for a recess so I may inform other counsel what questions I will like to have them ask so I can put on record what really happened then.

ATTORNEY CAPDEVILLE: Yes, Your Honor.

The government would have no problems having it stipulated instead of having him testify to the fact that he did not use the bathroom within first three to seven minutes or whatever. Reason said seven minutes, because there's been some kind of—different officers were present at the time and had different times when they heard the toilet flush. That's basically an average figure, two and seven minutes. We have no objection to having it stipulated.

THE COURT: All right.

Since Mr. James requests a recess, I'm going to permit the testimony now without prejudice to the question of whether it will be permitted at the trial of this action. We'll take a 10-minute recess so, Mr. James, you may consult with your co-counsel about questions.

---

ATTORNEY JAMES: Will this be without prejudice to my appearing as counsel?

THE COURT: That I will look into. No one put you into that house except yourself, so I don't believe that I can bar the government from calling you on this occasion.

App. at 111–113.

6.    ATTORNEY JAMES: Well, I would like to say that Mr. Capdeville asked if I would stipulate whether I had used the toilet in that house, and the answer is never.

THE COURT: You will not stipulate?

ATTORNEY JAMES: I will stipulate that I never used the toilet in that house.

THE COURT: Did you consult with him about possibly stipulating to this? I mean feelings are very strong, and we haven't even gotten to the trial.

ATTORNEY CAPDEVILLE: I apologize to the court, Your Honor.

THE COURT: All right.

Attorney James, do you stipulate that during the period of time—give me the stipulation on the record.

ATTORNEY CAPDEVILLE: Yes.

During the period of time that Mr. James arrived at the house ... and went inside the house with his client, Miss Jo Ann Zepp, that within the period of time between him going into the house and seven minutes he did not use any of the bathrooms.

THE COURT: Mr. James?

ATTORNEY JAMES: I did not use any of the bathrooms then or ever.

THE COURT: All right: the stipulation: *At no time when he was in the house were any of the bathrooms used by him.*

ATTORNEY JAMES: I would like to make a further stipulation that at no time I was in the house was the bathroom used.

Would you agree to that?

THE COURT: Now I think we better take a recess to see if you want to testify.

App. at 113–114 (emphasis added).

7.    In its opening statement, the government misstated the stipulation: "And we will also have a stipulation by Attorney James that says that while he was in the house he did not flush any toilet or any cocaine down there either."

App. at 126.

ATTORNEY JAMES: Correct, as far as I'm concerned.

THE COURT: Mr. Capdeville?

ATTORNEY CAPDEVILLE: Yes.

App. at 202 (emphasis added).

The jury found Jo Ann Zepp guilty of simple possession of cocaine and destruction of evidence. She then filed a timely motion for a new trial which was denied after an evidentiary hearing. This appeal followed.

## II.

From the standpoint of basic human rights, the framers of our nation's Bill of Rights wanted to make the new government of the United States fundamentally different from that of its former ruler, England. In the sixth amendment, they enumerated, with specificity, several critical rights guaranteed the accused "in all criminal prosecutions" by the federal government. Among these rights were the assurances that the accused would have an "impartial trial" and the "Assistance of Counsel for his defence." U.S. Const. amend. VI.

This amendment was a significant break from tradition because "[o]riginally, in England, a person charged with treason or felony was denied the aid of counsel, except in respect of legal questions which the accused himself might suggest." *Powell v. Alabama*, 287 U.S. 45, 60, 53 S.Ct. 55, 61, 77 L.Ed. 158 (1932).[8] Several colonies, Maryland as an example, declared "[t]hat, in all criminal prosecutions, every man hath a right ... to be allowed counsel", Md. Const. of 1776, art. XIX, but it was not until 1836, when by act of Parliament, that "the full right was granted in respect of felonies generally" to citizens of England. *See*, 1 Cooley's Const. Lim. 8th ed., 698, *et seq.*, and notes.

While the right to assistance of counsel was assured in federal criminal prosecutions, the earliest jurisprudential debates in America pertained to whether the states were similarly obligated to appoint effective counsel for defendants in capital cases. Later the question arose as to whether adult defendants and minor defendants in criminal prosecutions by the state were entitled to counsel in non-capital felony cases. The trilogy of *Powell v. Alabama, supra, Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and *In re Gault*, 387 U.S. 1, 87 S.Ct. 1428, 18 L.Ed.2d 527 (1967) established the American foundation that under the due process clause of the fourteenth amendment all persons are entitled to assistance of counsel when prosecuted in state courts.

During the last two decades, the major jurisprudential focus has shifted from the issue of the right to counsel to the more subtle and problematic question of *effective* assistance of counsel under the fifth, sixth and fourteenth amendments. With difficulty and divisiveness our courts have attempted to define what constitutes deficient performance by counsel, and whether counsel's errors were so serious as to de-

---

**8.** As the Supreme Court noted in *Powell v. Alabama:*

> An affirmation of the right to the aid of counsel in petty offenses, and its denial in the case of crimes of the gravest character, where such aid is most needed, is so outrageous and so obviously a perversion of all sense of proportion that the rule was constantly, vigorously and sometimes passionately assailed by English statesmen and lawyers. As early as 1758, Blackstone, although recognizing that the rule was settled at common law, denounced it as not in keeping with the rest of the humane treatment of prisoners by the English law. "For upon what face of reason," he says, "can that assistance be denied to save the life of a man, which yet is allowed him in prosecutions for every petty trespass?" 4 Blackstone 355. One of the grounds upon which Lord Coke defended the rule was that in felonies the court itself was counsel for the prisoner. 1 Cooley's Const.Lim., *supra.* But how can a judge, whose functions are purely judicial, effectively discharge the obligations of counsel for the accused? He can and should see to it that in the proceedings before the court the accused shall be dealt with justly and fairly. He cannot investigate the facts, advise and direct the defense, or participate in those necessary conferences between counsel and accused which sometimes partake of the inviolable character of the confessional.
>
> The rule was rejected by the colonies.

*Id.* at 60–61, 53 S.Ct. at 61.

prive the defendant of a fair trial. *See, e.g., Strickland v. Washington,* — U.S. ——, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984); *Cuyler v. Sullivan,* 446 U.S. 335, 344, 100 S.Ct. 1708, 1716, 64 L.Ed.2d 333 (1980); *McMann v. Richardson,* 397 U.S. 759, 770–771, 90 S.Ct. 1441, 1448–1449, 25 L.Ed.2d 763 (1970).

### A.

The recent Supreme Court decisions of *Strickland v. Washington, supra,* and *United States v. Cronic,* — U.S. ——, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984) now set forth "the proper standards for judging a criminal defendant's contention that the Constitution requires a conviction ... to be set aside because counsel's assistance at the trial ... was ineffective." *Strickland,* 104 S.Ct. at 2056.

By virtue of the sixth amendment right to effective assistance of counsel, principles of due process, applicable to legal proceedings generally, are preserved and reinforced. Justice Stevens, writing for the majority in *United States v. Cronic,* observed that "the right to the effective assistance of counsel is recognized not for its own sake, but because of the effect it has on the ability of the accused to receive a fair trial." 104 S.Ct. at 2046. In the *Strickland* decision, handed down the same day, Justice O'Connor elaborated on the intricate relationship of the sixth amendment right to effective assistance of counsel and the fifth amendment due process guarantee to a fair trial:

> [T]he Sixth Amendment right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial. The Constitution guarantees a fair trial through the Due Process Clauses, but it defines the basic elements of a fair trial ... through the several provisions of the Sixth Amendment, including the Counsel Clause ....

*Strickland,* 104 S.Ct. at 2063. Thus, the "benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* at 2064. The fundamental question thus becomes whether counsel's conduct in this instance precluded the "proper functioning of the adversarial process" and thereby deprived Jo Ann Zepp of a fair trial.

In this case, Jo Ann Zepp would have us recognize that her sixth amendment right to effective assistance of counsel is now no longer contingent upon the historical evolution of some amorphous concept. To the contrary, she strenuously asserts that at any point in the history of this country, the events that took place at her trial would be a flagrant breach of the fifth and sixth amendments.

■ From the litany of cases since *Powell v. Alabama, supra,* it is beyond dispute that the sixth amendment guarantee of effective assistance of counsel comprises two correlative rights: the right to counsel of reasonable competence, *McMann v. Richardson,* 397 U.S. at 770–71, 90 S.Ct. at 1448–49, and the right to counsel's undivided loyalty, *Wood v. Georgia,* 450 U.S. 261, 271, 101 S.Ct. 1097, 1103, 67 L.Ed.2d 220 (1981).

As the Court acknowledged in *Strickland,* courts must differentiate between counsel's duty to perform competently and counsel's duty to avoid conflicts of interest:

> Representation of a criminal defendant entails certain basic duties. Counsel's function is to assist the defendant, and hence *counsel owes the client a duty of loyalty, a duty to avoid conflicts of interest.* See *Cuyler v. Sullivan, supra,* 446 U.S., at 346, 90 S.Ct., at 1717. From counsel's function as assistant to the defendant derive the overarching duty to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution. *Counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.*

See *Powell v. Alabama,* 287 U.S., at 68–69, 53 S.Ct., at 63–64

*Strickland,* 104 S.Ct. at 2065 (emphasis added). It must be borne in mind, however, that *Strickland* distinguishes not only between the duty owed by counsel, but also articulates the different standards by which an alleged breach of duty must be judged. *Id.* at 2064.

Jo Ann Zepp's allegation of a denial of effective assistance of counsel is premised upon trial counsel's breach of the duty of loyalty and failure to avoid conflicts of interest. She does not seriously challenge James' general competence as a lawyer. Presumably, he knew the relevant rules of law, made the critical objections and prepared his case adequately. If those were the only three elements by which one measured the competence of counsel, certainly he complied with the level of performance which this court has declared meets the constitutional standard as articulated in *Moore v. United States,* 432 F.2d 730, 736 (3d Cir.1970) (in banc), and recently reaffirmed in *Government of the Virgin Islands v. Bradshaw,* 726 F.2d 115 (3d Cir. 1984). Where an allegation of ineffective assistance of counsel has been made, we normally assess whether the attorney exercised "the customary skill and knowledge which normally prevails at the time and place." *Moore,* 432 F.2d at 736. Application of the *Moore* standard, however, generally involves an evaluation of counsel's *competence* and not counsel's *loyalty.*

Zepp's complaint is one of an even more fundamental nature than that of traditional lawyer competence. She asserts that she:

was denied effective assistance of counsel because her trial counsel had an actual conflict of interest due to his potential criminal liability for the same charges on which appellant was tried.

Appellant's Brief at 31. In short, she claims that her own lawyer testified against her, that her own lawyer put in damaging evidence against her, and that the evidence to which her own lawyer stipulated in order to potentially extricate himself may have been enough to tip the scales in favor of her conviction. In effect, she argues that rather than James exercising his sixth amendment obligation to give legal assistance to the defendant, he instead actually and intentionally rendered legal assistance to the prosecution.

Unlike those situations where the challenge is to counsel's competency and the defendant is required to affirmatively demonstrate that (1) counsel's performance was deficient and that (2) the deficient performance actually prejudiced the defense, *Strickland* teaches that in certain sixth amendment contexts, prejudice is presumed from the circumstances. Specifically, ·the Court stated:

One type of actual ineffectiveness claim warrants a similar, though more limited, presumption of prejudice. In *Cuyler v. Sullivan,* 446 U.S., at 345–350, 90 S.Ct., at 1716–1719, the Court held that *prejudice is presumed when counsel is burdened by an actual conflict of interest.* In those circumstances, counsel breaches the duty of loyalty, perhaps the most basic of counsel's duties. Moreover, it is difficult to measure the precise effect on the defense of representation corrupted by conflicting interests. *Given the obligation of counsel to avoid conflicts of interest and the ability of trial courts to make early inquiry in certain situations likely to give rise to conflicts,* see, e.g., Fed.Rule Crim.Proc. 44(c), it is reasonable for the criminal justice system to maintain a fairly rigid rule of presumed prejudice for conflicts of interest . . . . Prejudice is presumed only if the defendant demonstrates that counsel "actively represented conflicting interests" and "that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan, supra,* 446 U.S., at 350, 348, 90 S.Ct. at 1719, 1718 (footnote omitted).

*Strickland,* 104 S.Ct. at 2067 (emphasis added). The *Strickland* Court thereby reaffirmed the previous holding of its decision in *Cuyler v. Sullivan, supra,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). In *Cuyler v. Sullivan, supra,* the Supreme

Court reversed and remanded a decision of this court wherein a state prisoner seeking federal habeas corpus relief claimed conflict of interest due to multiple representation. On appeal from the district court's holding that there had been no multiple representation, we determined not only that there was multiple representation as a matter of law but that a *possibility* of a conflict of interest was sufficient to constitute a violation of the sixth amendment right to effective assistance of counsel. *United States ex rel. Sullivan v. Cuyler,* 593 F.2d 512 (3d Cir.1979) (*Sullivan I*). The Supreme Court reversed and remanded requiring a demonstration by the petitioner that "actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan,* 446 U.S. at 348, 100 S.Ct. at 1718. We in turn remanded to the district court which granted the petition for writ of habeas corpus, following an evidentiary hearing, on the basis that a subsequent evidentiary hearing provided sufficient proof of an actual conflict of interest that adversely affected counsel's performance. We affirmed the ruling of the district court. *Sullivan v. Cuyler,* 723 F.2d 1077 (3d Cir.1983) (*Sullivan II*).

However, before we undertake an analysis of whether in fact Zepp's attorney was incapable of representing his client in a constitutionally adequate manner given alleged conflict of interest, it is imperative that we first determine whether it is appropriate for this court to review this claim on direct appeal, or whether it may only be validly raised in a collateral proceeding.

### B.

Several recent opinions by our court indicate that a criminal defendant may not attack the competence of counsel on a direct appeal, but should pursue the issue through 28 U.S.C. § 2255 (1976) actions. *See e.g., United States v. Swinehart,* 617 F.2d 336 (3d Cir.1980); *United States v. Rad-O-Lite of Philadelphia,* 612 F.2d 740 (3d Cir.1979); *United States v. Garcia,* 544 F.2d 681 (3d Cir.1976); 28 U.S.C. § 2255.

As a general policy, courts of appeals have "refused to notice errors of this type in the absence of an objection at trial", and we have likewise noted a "preference for this course." *Rad-O-Lite,* 612 F.2d at 744. The rationale underlying these cases is that an evidentiary hearing must be conducted to establish whether counsel's performance was or was not up to the competency standard espoused in *Moore v. United States, supra,* 432 F.2d 730 (3d Cir.1970).

We have thus declined to hear a claim of ineffective assistance of counsel where that issue has not been specifically raised at trial because "[s]uch claims frequently involve questions regarding *conduct that occurred outside the purview of the district court* and therefore can be resolved only after a factual development at an appropriate hearing." *Swinehart,* 617 F.2d at 340 (emphasis added).

Where the claim of ineffective assistance of counsel is based on attorney incompetence the lack of a fully developed record readily justifies our reluctance "to inquire into the elements of strategy or tactics that may have entered into [defense counsel's actions]." *Garcia,* 544 F.2d at 684. Therefore, inquiry along these lines may often necessitate a remand for an evidentiary hearing to develop the facts about counsel's role in the representation of the defendant and to provide the defendant a full and fair hearing on the issue. Similarly, there may be cases where an attorney's conflict of interest may more appropriately be considered in the course of a habeas corpus collateral attack, *Sullivan II,* 723 F.2d at 1084–1085, or common-law writ of error *coram nobis. Rad-O-Lite,* 612 F.2d at 744.

In this case, however, we conclude that we do have an adequate record and thus an additional evidentiary hearing need not be conducted to develop the facts. *See, e.g., United States v. Young,* 644 F.2d 1008 (4th Cir.1981), later app. 677 F.2d 381 (4th Cir. 1982); *Parker v. Parratt,* 662 F.2d 479 (8th Cir.1981), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 91 (1982); *Ross v. Heyne,* 638 F.2d 979 (7th Cir.1980).

■ Furthermore, this court recognizes an important countervailing policy of not "penalizing the accused for the failure of its attorney to object at trial ..." where there is a claim of attorney conflict of interest. *Rad-O-Lite*, 612 F.2d at 744. To do so "would make sense only if we accept the proposition that the responsibility for protecting against conflicts of interests rests entirely upon the accused." *Id.* Thus, where an objection has been properly made at trial, or, where the record clearly shows actual conflict of interest and objections made at trial did or should have put the trial court on notice that potential conflict of interest existed,[9] this court's "preference" for developing such issues on collateral attack need not be followed, and a full consideration of the issue is appropriate.

While direct appeals must generally be distinguished from collateral appeals, given the plethora of issues that would constitute reversible error if raised on a direct appeal but would not constitute reversible error if raised in the context of a 28 U.S.C. § 2255 or 28 U.S.C. § 2254 proceeding, the Supreme Court in *Strickland* has indicated that:

> The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. As indicated by the "cause and prejudice" test for overcoming procedural waivers of claims of error, the presumption that a criminal judgment is final is at its strongest in collateral attacks on

that judgment .... An ineffectiveness claim, however, as our articulation of the standards that govern decision of such claims makes clear, is an attack on the fundamental fairness of the proceeding whose result is challenged.

104 S.Ct. at 2070 (emphasis added).

■ We therefore believe that the defendant's claim of ineffectiveness is appealable and that it also falls within the ambit of our holding in *Sullivan II*.[10] Thus, in order for the defendant to make out a violation of her sixth amendment rights, she must establish that an actual conflict of interest adversely affected counsel's performance but she need not demonstrate actual prejudice. *Id.* at 1084.

### III.

■ Whether the representation a defendant received at trial was "constitutionally inadequate" is a mixed question of law and fact. *Strickland v. Washington*, 104 S.Ct. at 2070; *see Cuyler v. Sullivan*, 446 U.S. at 342, 100 S.Ct. at 1714. The "clearly erroneous rule" is inapplicable and we are called upon to "freely review the district court's conclusion." *United States ex rel. Johnson v. Johnson*, 531 F.2d 169, 174 n. 12 (3d Cir.), *cert. denied*, 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Thus, an allegation of ineffective assistance of counsel requires that we conduct a careful inquiry into the circumstances surrounding the particular case, mindful that

> [a] determination whether any given action or omission by counsel amounted to ineffective assistance cannot be divorced

---

9. Trial counsel's objections, *albeit* not at trial but at the suppression hearing, should have sufficiently put the trial court on notice with respect to the issue of conflict of interest. Trial counsel asserted vigorously that his testifying as a witness for the prosecution would jeopardize his position as defense counsel. App. at 112.

10. The government argues that this court's decision in *United States v. Baynes*, 687 F.2d 659 (3d Cir.1982) stands for the proposition that ineffective assistance of counsel constitutes reversible error only where it is shown that there was actual prejudice. Zepp contends that *Baynes* is distinguishable because it involved a habeas corpus proceeding, implicitly asserting that "actual

prejudice" may be required in that context, but not on direct appeal. *Baynes* is inapplicable not because the proceeding was habeas corpus as opposed to direct appeal but because it raised the issue of defense attorney's competence, while the issue before this court is defense counsel's conflict of interest. As the Supreme Court's decisions in *Cuyler v. Sullivan, supra*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980) and *Strickland, supra*, as well as our decision in *Sullivan II* indicate, the standard for reversible error in a conflict of interest context is a showing of actual conflict and consequent adverse effect on counsel's performance which warrants a presumption of prejudice.

from consideration of the peculiar facts and circumstances that influenced counsel's judgment.

*United States v. DeCoster*, 624 F.2d 196, 203 (D.C.Cir.1979) (in banc) (plurality opinion).

In *Sullivan II*, we held that "[t]o prove a conflict of interest violative of the sixth amendment," a defendant had to "prove (1) multiple representation that (2) created an actual conflict of interest that (3) adversely affected the lawyer's performance." 723 F.2d at 1084.

Guided by these principles, we must examine the conduct of defendant's trial counsel in light of prevailing professional and ethical standards, as well as the particular facts of this case, to determine whether Jo Ann Zepp received the representation the Constitution demands.

### A.

The typical conflict of interest cases giving rise to claims of ineffective assistance of counsel involve multiple representation of clients—the conflict exists between the interests of one defendant and the interests of other defendants served by the same attorney—a matter not infrequently considered by the Supreme Court. *See Strickland, supra; Wood v. Georgia, supra; Cuyler v. Sullivan, supra; Holloway v. Arkansas*, 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426 (1978); *Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942).

While in *Sullivan II* we designated "multiple representation" as one element necessary to establish a conflict of interest violative of the Constitution, our decision must not be construed so narrowly as to encompass only those factual situations where counsel simultaneously represents different defendants. The Supreme Court in *Cuyler v. Sullivan* indicated that the critical inquiry is whether counsel "actively represented conflicting interests". 446 U.S. at 350, 100 S.Ct. at 1719. However, as Justice Marshall so aptly observed in his dissenting opinion in *Cuyler v. Sullivan*, " '[c]onflict of interests' is a term that is

often used and seldom defined." 446 U.S. at 356, n. 3, 100 S.Ct. at 1722, n. 3. Fortunately, prevailing norms of practice provide some guidance. *Strickland*, 104 S.Ct. at 2065.

The Virgin Islands Bar Association adheres to the Model Code of Professional Responsibility adopted by the American Bar Association. 5 V.I.C. Appendix V, Rule 57(e)(2). The Model Code of Professional Responsibility proscribes the representation of conflicting interests in order to avoid interference with counsel's fiduciary obligations to maintain undivided loyalty, to preserve attorney-client confidentiality and to assure competent representation for each client:

> Canon 5 requires that a lawyer exercise independent judgment on behalf of a client. DR 5-105 proscribes employment which may interfere with the lawyer's "independent professional judgment" on behalf of another client. The Code does not specifically refer to "conflicting" interests, but describes the problem in EC 5-14 as concerning clients who have "differing interests," whether such interests be "conflicting, inconsistent, diverse or otherwise discordant." The Code's prohibition focuses upon the relationship between the clients, that is differing interests which may affect the independence of the attorney's professional judgment.

Mallen and Levit, *Legal Malpractice* 241 (2d ed. 1981).

We believe that, despite the fact that this case does not present the usual multiple representation situation, "conflicting interests" nonetheless arise out of personal interests of counsel that were "inconsistent, diverse or otherwise discordant" with those of his client and which affected the exercise of his professional judgment on behalf of his client. Model Code of Professional Responsibility EC 5-2; EC 5-14 (1980).

It is now well-established that multiple representation or merely the possibility of conflicting interest does not constitute a constitutional violation. The conflict of in-

terest must be "actual." *Wood v. Georgia, supra.* This court adopted the American Bar Association's definition of conflict of interest in the Canons of Professional Ethics and held in *Sullivan II* that:

[a]ctual conflict of interest is evidenced if, during the course of the representation, *the defendants' interests diverge with respect to a material factual or legal issue or to a course of action.*

723 F.2d at 1086. (emphasis added).

It is the government's position that there was no *actual* conflict of interest because Zepp's trial attorney was never subject to any criminal charges as a result of his conduct on December 18, 1982 and thus faced no potential liability. We conclude that an *actual* conflict of interest is present on this record. In at least two respects trial counsel's interest and the defendant's interest "diverge[d] with respect to a material factual or legal issue or to a course of action." *Id.* at 1086. First, trial counsel could have been indicted for the same charges on which he represented Zepp, and second, trial counsel was a witness for the prosecution. As to both points, Zepp asserts that defense counsel had a duty to withdraw from further representation and we agree.

(i) *Potential Criminal Liability of Defense Counsel*

■ While there is no direct evidence of wrongdoing by trial counsel, it is not necessary to assume wrongdoing to conclude that he had an actual conflict of interest—trial counsel had equal access and opportunity while alone in the house with Zepp to flush cocaine down the toilet. It is clear that he was potentially liable for aiding and abetting or encouraging the destruction of evidence.

Even if not criminally charged for such events, trial counsel could have faced severe disciplinary consequences if it were ever known that he was involved in the destruction of evidence. American Bar Association, *Canons of Professional Ethics;* Canon 15 (1967). Trial counsel neither avoided professional impropriety nor the

appearance of impropriety. Model Code of Professional Responsibility DR 9–101 (1980).

Therefore, it is unrealistic for this court to assume that Zepp's attorney vigorously pursued his client's best interest entirely free from the influence of his concern to avoid his own incrimination. *United States v. Salinas,* 618 F.2d 1092 (5th Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *In Re Investigation Before February, 1977, Lynchburg Grand Jury,* 563 F.2d 652 (4th Cir.1977); *See United States v. Clarkson,* 567 F.2d 270 (4th Cir.1977). In circumstances such as these, when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces potential liability for those charges, he has an actual conflict of interest. *See United States v. Crockett,* 506 F.2d 759 (5th Cir.) *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975). We agree with Zepp's contention that from these facts alone there was an actual conflict of interest which required withdrawal by trial counsel or disqualification by the court.

(ii) *Defense Counsel as Prosecution Witness*

■ Secondly, the stipulation made by Zepp's counsel at the suppression hearing was admitted into evidence and beyond dispute contained inferences adverse to Zepp's presumption of innocence.

For purposes of analysis we will repeat the stipulation and the colloquy which preceded it:

ATTORNEY CAPDEVILLE: Your Honor, could we approach sidebar?

THE COURT: Yes, sir.

Thereupon, counsel for all parties approached the bench and conferred with the court at sidebar as follows:

THE COURT: That isn't the stipulation. The stipulation, as I remember it, was Mr. James was willing to stipulate during the period of time he was in the premises he did not flush any toilets.

That was a simple stipulation; is that correct?

ATTORNEY JAMES: That is correct.

ATTORNEY CAPDEVILLE: Okay.

THE COURT: I don't think you have to use any words like cocaine with Mr. James. I'll tell the jury, if that was what your stipulation was.

ATTORNEY CAPDEVILLE: Yes, Your Honor.

ATTORNEY JAMES: You know what I wanted.

[Thereupon, counsel for all parties resumed their places, and proceedings were conducted in open court, as follows:]

THE COURT: Ladies and gentlemen of the jury, the parties have entered into a stipulation, and a stipulation is an agreement by the parties that in this particular instance, *if Attorney John F. James were called as a witness and sworn, that he would testify that during the period of time that he was in the premises at 38 Estate Little Fountain on December 18th, 1982, he did not flush any toilets, that he did not personally flush any toilets.*

Is that a correct statement of the stipulation, Mr. James?

ATTORNEY JAMES: Correct, as far as I'm concerned.

THE COURT: Mr. Capdeville?

ATTORNEY CAPDEVILLE: Yes.

THE COURT: *So you may take it, if he had been called and he testified, that is what he would testify to under oath.*

App. at 201–203 (emphasis added).

At the outset it must be emphasized that this stipulation was introduced as substantive evidence for the jury to consider when making its determination of the innocence or guilt of Jo Ann Zepp. This stipulation must be considered in relation to the other evidence that had been introduced by the government. The jury had been informed that on December 21, 1982, pursuant to a search warrant, a search of the septic tank of Zepp's home produced 40 triangular-shaped plastic bags, 20 of which tested positive for cocaine residue. Plastic bags of cocaine do not fall off of trees into septic tanks. The only way in which those plastic bags could have gotten into the septic tank was by their being flushed down the toilet. Accordingly, anyone who had access to the toilets at 38 Little Fountain during the time of the arrest on December 18 could conceivably have been attempting to destroy the evidence. The record established that when attorney Jack James and Jo Ann Zepp went into the house, they were the only persons on the premises and a toilet was heard to flush several times.

From this evidence and the stipulation, a jury could have made any of the following inferences: ·(1) Jack James alone flushed the toilet and therefore he was probably attempting to destroy the evidence or (2) Jo Ann Zepp alone flushed the toilet for the same reasons or (3) both of them flushed the toilet for the same reasons. Statistically, without any further evidence, if only one person flushed the toilet, there was a 50% probability that James did it and a 50% probability that Zepp did it. The prosecutor was obviously aware that a 50% probability factor might create in the minds of some jurors a reasonable doubt as to Jo Ann Zepp's guilt. Therefore, presumably wanting to eliminate that doubt, he "required" James to testify and thus the significant inference of doubt which could have been favorable to the defendant was eradicated by the equivalent of sworn testimony offered by her own lawyer.

Also, we must note how carefully the stipulation was drawn. It did not state that *no* toilets were flushed. Rather it was a statement that "*he* did not flush any toilets, that *he* did not personally flush any toilets." *Id.* at 202 (emphasis added).

Lastly, the stipulation was referred to by the trial judge in his instructions to the jury:

You·are the sole finders of the facts, and you find those facts only from the evidence in this case consisting of the testimony of persons, the exhibits that you will bring with you that have been admitted, and I think there was one stipulation

—that's right; there was a stipulation by Attorney James that I gave you. That is the evidence, and that forms the basis for your decision.

Transcript ("Tr.") at 838.

One must also consider the cumulative impact of the trial judge's proper instructions on circumstantial evidence, Tr. 823, the government's summation to the jury concerning Jo Ann Zepp's unlawful destruction of cocaine by flushing the toilets, Tr. 761–62, and the assertion that "the police should have never let [James and Zepp] inside the house ... a crime scene ...." Tr. 814. Moreover, neither Jo Ann Zepp nor any of the other defendants testified. Therefore, the critical link was supplied by Zepp's own attorney because his statement, if believed, left only *one* other inference—if he did not flush the toilet the only person who could have flushed the toilet was Jo Ann Zepp. Thus, given the evidence that the toilet flushed while Zepp and defense counsel were alone in the house, and without *any other* evidence indicating who between the two of them flushed the toilet, the reasonable inference is that Zepp flushed the toilet thereby destroying evidence. With your own lawyer testifying against you, should there be any surprise that the jury finds you guilty? Defense counsel testified against Jo Ann Zepp and she was denied the right to cross-examine him in violation of the sixth amendment.

Not only was Jo Ann Zepp denied her sixth amendment right to cross-examine but counsel's testimony deprived her of effective assistance of counsel. The roles of an advocate and of a witness are inherently inconsistent. The Ethical Considerations of the Model Code of Professional Responsibility provide:

Occasionally a lawyer is called upon to decide in a particular case whether he will be a witness or an advocate. If a lawyer is both counsel and witness, he becomes more easily impeachable for interest and thus may be a less effective witness. Conversely, the opposing counsel may be handicapped in challenging the credibility of the lawyer when the lawyer also appears as an advocate in the case. An advocate who becomes a witness is in the unseemly and ineffective position of arguing his own credibility. *The roles of an advocate and of a witness are inconsistent; the function of an advocate is to advance or argue the cause of another, while that of a witness is to state facts objectively.*

EC 5–9 (emphasis added).

We have searched the cases carefully and have found no instance where defense counsel was actually permitted to testify against his own client while purporting to continue in a representative capacity. Nor is this an instance in which counsel's stipulation came as a matter of surprise. At the suppression hearing the government had made clear their position that James would be called as a witness. After the suppression hearing, recognizing this possibility, James could have withdrawn as counsel; instead his response at the suppression hearing was that if "I am forced to go to the stand, I want it with the explicit situation [sic] that I will not be barred from participating when the case is held." App. at 112. The sixth amendment is designed to give the defendant a full panoply of rights. The framers of the amendment did not propose it to assure an individual counsel a right to testify against his own client and still participate in the case.

Arguably, the stipulation was even coerced by reason of the fact that the government presented Zepp's counsel with what was in effect an ultimatum—either enter into the stipulation or be subjected to examination as a witness and face possible implication as a coconspirator. Trial counsel's interest in testifying on his own behalf impaired the exercise of independent professional judgment on behalf of his client. From our view, the admission of such testimony is so egregious that it constitutes a total abandonment of the loyalty which counsel owes his client. Thus, we also agree with Jo Ann Zepp's contention that trial counsel was required to withdraw regardless of whether his testimony would

be exculpatory or inculpatory. Such a statement given under these circumstances violates her fifth and sixth amendment due process rights to a fair trial.

### C.

■ The defendant also contends that the trial judge was put on notice of the conflict and made no determination as to whether she fully understood the nature of the conflict, did not seek an intelligent and competent waiver, and did not disqualify defense counsel. *Government of the Virgin Islands v. John,* 447 F.2d 69 (3d Cir. 1971). We agree and conclude that the trial judge abused his discretion in failing to do so.

Normally, the trial court should conduct an evidentiary hearing or factual inquiry to determine whether disqualification is appropriate and should inquire into the nature of the conflict and the client's awareness of the conflict. The court should also determine whether there has been a waiver of the conflict, whether the waiver was effective or whether a waiver was possible. *See generally, Glasser v. United States, supra; Government of the Virgin Islands v. John, supra; In Re Investigation before February, 1977, supra.*

There is nothing in the record before this court to show that either the court or defense counsel explained to Jo Ann Zepp the conflict which counsel faced given his presence in the house at the time of the toilet-flushing or his conflict after he was called as a prosecution witness. The court did not rule as to whether there was a conflict and no waiver was received or requested from Zepp.

Certainly, the trial court being apprised of this potentially damaging evidence was obligated to question the defendant most explicitly to ascertain whether this was a right she was knowingly waiving. It might even be questionable as to whether a court could ever permit a defendant to knowingly waive her right to the effective assistance of counsel when her own lawyer will testify against her. *See United States v. DeFalco,* 644 F.2d 132 (3d Cir.1980), *reh. denied,*

454 U.S. 1117, 102 S.Ct. 693, 70 L.Ed.2d 655 (1981).

In *Glasser,* the Supreme Court held that the right to assistance of counsel "contemplates that such assistance be untrammeled and unimpaired by a court order requiring that one lawyer shall simultaneously represent conflicting interests." 315 U.S. at 70, 62 S.Ct. at 465. Although *Glasser* dealt with an allegation of ineffective assistance of counsel in the context of joint representation of defendants, certain basic principles emerge without ambiguity. The court reasoned in *Glasser:*

> Upon the trial judge rests the duty of seeing that the trial is conducted with solicitude for the essential rights of the accused .... *The trial court should protect the right of an accused to have the assistance of counsel.*

315 U.S. at 71, 62 S.Ct. at 465. The trial court in this case failed to protect the right of Jo Ann Zepp to have the effective assistance of counsel.

### D.

■ Having determined that an actual conflict of interest exists on this record, we hold that it was not incumbent upon the defendant to show actual prejudice but prejudice may be presumed from the surrounding circumstances. The relevant consideration is whether the actual conflict of interest "adversely affected" counsel's performance. It is inconceivable to us that the admission of the stipulation into evidence did not have an "adverse effect" on Zepp. We conclude that where, as in the instant case, the attorney was not only faced with potential criminal liability, but in fact became a prosecution witness while simultaneously representing the defendant, not only was there an "adverse effect" but the prejudice is clear and unequivocal.

### IV.

For the foregoing reasons, we conclude that the defendant's constitutional rights have been violated. We will therefore re-

verse and remand with directions to grant a new trial.

GARTH, Circuit Judge, concurring:

I agree that Jo Ann Zepp must be tried anew. I write separately, however, because I am not in accord with the majority's analysis. Nor can I agree with those portions of the majority opinion which discuss James' potential criminal liability or which imply his involvement as a criminal co-conspirator (Maj.Op. at 137, 138, 139).

I suggest that the majority's emphasis on a conflict of interest analysis and on James' potential criminal complicity is misplaced. The proper focus in analyzing Zepp's sixth amendment claim should not be on James' purported conflict of interest which necessarily implicates a speculative criminal complicity and which would require an evidentiary hearing. Rather, the correct focus should be on whether James' representation of Zepp was adequate and sufficient to satisfy Zepp's sixth amendment guarantee of assistance of counsel—an analysis, which on this record requires no evidentiary hearing.

I.

Sixth amendment claims of ineffective assistance of counsel are generally divided into two categories, those involving conflict of interest and those involving deficiency in representation. Conflict of interest cases traditionally are concerned with an attorney who represents multiple defendants, where the defendants' interests may be actually or potentially divergent. *Wood v. Georgia*, 450 U.S. 261, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981); *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). On the other hand, ineffective as-

sistance of counsel claims generally involve deficiency in representation. These are classically situations in which the attorney is alleged to have been inadequate in the representation of his client. *Strickland v. Washington*, —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Here, the majority contends that the "potential" criminal liability of James was responsible for creating a "conflict of interest" between James and Zepp. Underlying the majority's analysis is its concern that while James was defending Zepp, he was also engaged in an attempt to exculpate himself from criminal liability. However, the record reveals no evidence to suggest that James was criminally liable nor does it disclose that James was concerned with his own vindication.[1] I find no basis in the record supporting a conflict of interest between James and Zepp as the majority has characterized it. I do find that the stipulation into which James entered had the result of rendering his performance as counsel to Zepp seriously inadequate to the extent that it prejudiced the fairness of Zepp's trial. *See Uptain v. United States*, 692 F.2d 8, 10 (5th Cir.1982). It is only because of this circumstance that I am persuaded that Zepp must be tried anew.

A.

In granting Zepp a new trial, the majority has relied on the fact that James' interest conflicted with that of Zepp's because he himself was implicated as a potential suspect or co-conspirator. There is no evidence in the record establishing either the fact of his implication or the conclusion of a conflict of interest. James at no time was ever subject to any criminal charges, investigations, or disciplinary actions as a result of his presence in the house with Zepp at

---

1. As I read the record, the concern that was expressed by James did not involve any potential criminal liability or any attempt on his part to escape it. His only concern was that he not be required to step aside as Zepp's attorney. "If I am forced to go to the stand, I want it with the explicit situation [sic] that I will not be barred from participating when the case is held...." (App. at 112).

Whatever may be said of James' insensitivity to this circumstance of appearing as counsel while in effect testifying against his client, it is a far cry from suggesting that James himself was criminally liable or possibly implicated as a co-conspirator with Zepp or other associates.

the time that the alleged flushing took place. Indeed, the United States Attorney disclaimed any criminal complicity on the part of James (Appellee's Brief at 39), just as Zepp, although claiming a conflict, denied that James was guilty of any wrongdoing.[2]

What the record does disclose is that when the police first arrived at Zepp's house to arrest Williams, and while they were still outside the house, they heard toilets being repeatedly flushed. (App. at 163a, 191a, 206). James was not present at the Zepp house during this period. Only *after* Williams had been arrested and removed from the house did James first appear. It was at that time that James entered the Zepp house to meet with his client Jo Ann Zepp. Once again it was alleged that the toilets were flushed, and it was this latter flushing that gave rise to the government's effort to call James as a government witness. That effort eventually resulted in a stipulation being read to the jury that "if Attorney John F. James were called as a witness ... he would testify that during the period of time that he was in [the Zepp house], he [James] did not flush any toilets." (App. at 202).

The significance of the toilet flushings results from the fact that the police found glassine envelopes containing controlled substances in the septic tank. Yet the record is barren of any evidence as to which or either of these toilet flushings resulted in the deposit of the envelopes in the septic tank. Indeed, the envelopes in the tank could just as easily have been flushed down the toilet at the time of the initial flushing—a flushing that took place before James even appeared in the vicinity of the Zepp house.

Despite this circumstance, the majority opinion completely ignores the initial flushing and makes the unsupportable assertion that "trial counsel had equal access and

opportunity while alone in the house with Zepp to flush cocaine down the toilet. It is clear that he was potentially liable for aiding and abetting or encouraging the destruction of evidence." (Maj.Op. at 136). This faulty premise then leads the majority to conclude that "it is unrealistic for this court to assume that Zepp's attorney vigorously pursued his client's best interest entirely free from the influence of his concern to avoid his own incrimination." (Maj.Op. at 136.)

My disagreement with the majority's analysis stems from the fact that without the slightest evidence that it was James who either flushed controlled substances down the toilet or aided in such activities, the majority makes the unwarranted and speculative assumption that he did so. It must be remembered that the district court never conducted an evidentiary hearing as to what took place during the time in which James and Zepp were in the Zepp house, and that accordingly, we are dealing here with the trial record itself, rather than an evidentiary record directed to issues of either conflict of interest or inadequate representation.[3]

The record itself sheds little light on what transpired while James and Zepp were in the house. What minimal illumination exists, must be drawn from fragments of the pre-trial proceedings as they relate to the officers' testimony of "toilet flushings," and the septic tank search.

On January 26, 1983, approximately three weeks prior to the trial, a suppression hearing was held at which the government made known its intention to call James as a witness. At that time, the government indicated that it desired to ask James about his use of the bathroom in the Zepp house on the day that Zepp was arrested (December 18, 1982). James objected because he felt that if he were forced to testify it

2. Zepp's brief concedes that "there is no evidence of wrongdoing by James ...." (Appellant's brief at 31).

3. Normal procedure in both classes of cases is to order an evidentiary hearing so that the facts

with respect to inadequate representation or conflict of interest may be developed. *See United States v. Swinehart*, 617 F.2d 336 (3d Cir. 1980); *United States v. Rad-O-Lite of Philadelphia, Inc.*, 612 F.2d 740 (3d Cir.1979).

might bar him from "participating when the case is held." (App. at 112). Indeed, he sought an express ruling that he would not be barred from representing Zepp if he testified. The government then suggested that it would be satisfied with a stipulation. Again, James asked whether the stipulation would "be without prejudice to [his] appearing as counsel." (App. at 113). The following colloquy then took place:

ATTORNEY JAMES: Well, I would like to say that Mr. Capdeville asked if I would stipulate whether I had used the toilet in that house, and the answer is never.

THE COURT: You will not stipulate?

ATTORNEY JAMES: I will stipulate that I never used the toilet in that house.

\*   \*   \*   \*   \*   \*

ATTORNEY JAMES: I did not use any of the bathrooms then or ever.

THE COURT: All right; the stipulation: At no time when he was in the house were any of the bathrooms used by him.

ATTORNEY JAMES: I would like to make a further stipulation that at no time I was in the house was the bathroom used.

Would you agree to that?

THE COURT: Now I think we better take a recess to see if you want to testify.

ATTORNEY JAMES: If he doesn't want to stipulate, I'll withdraw it.

To the first one, not the second one.

Okay; you won't stipulate.

THE COURT: Let me now so there will be no misunderstanding on the record understand that Mr. James, that you stipulate that at no time while you were inside the residence at 38 Little Fountain [the Zepp house] was the bathroom used by you.

ATTORNEY JAMES: That is correct, sir; I so stipulate.

(App. 113–115).

For unknown reasons, the second stipulation that James sought to make, to wit: "that at no time I was in the house was the bathroom used", was never pursued. Therefore, all that can be gleaned from the record respecting James' alleged criminal complicity is that:

(1) Officers heard toilets flushing before James arrived at the Zepp house;

(2) James arrived at the Zepp house;

(3) Officers claimed to have heard toilets flush while James was in the Zepp house;

(4) James stipulated that he did not flush any toilets;

(5) James offered to stipulate that at no time while he was in the house was the bathroom used;

(6) Three days later a search of the septic tank produced 40 glassine envelopes, 20 of which tested positive for cocaine residue.

It is based on that meager record that the majority opinion discusses James' conflict of interest in terms of his potential criminal liability and his own desire to avoid criminal complicity. Ignoring the earlier flushings that took place on December 18, 1982 before James arrived at the Zepp house, the majority opinion concludes that, from the evidence of glassine envelopes being found in the septic tank, the presence of James and Zepp in the house, the sounds of an alleged second flushing, and James' stipulation that he had never flushed the toilet, the jury could have drawn the inference that there was a "50% probability" that James flushed the glassine envelopes down the toilet. (Maj.Op. typescript at 30). I suggest that the majority opinion has read the record unfairly in this respect.

The envelopes found in the septic tank could very well have been the result of Williams having disposed of them long before James had even arrived at the Zepp house. We, of course, cannot know what actually took place when James visited the Zepp house, and in the absence of a hearing to develop such a record, that information will remain unknown. What is known, however, is that there were *two*, not one, alleged sets of toilet flushings and that James admittedly was not present at the time of the first. I cannot be persuaded in

such a circumstance that, given the equivocality of the evidence and record, we should conclude as the majority has, that James' criminal complicity gave rise to a conflict of interest requiring a new trial for Zepp.

### B.

If the record before us supported James' criminal involvement, I would not fault the majority's analysis and conclusion. The cases cited in the majority opinion confirm this position, although it is significant that in each of those cases there had been a finding made by the district court that the attorney involved should be disqualified because he was either the target of a grand jury investigation or was under indictment. *See United States v. Salinas,* 618 F.2d 1092 (5th Cir.), *cert. denied,* 449 U.S. 961, 101 S.Ct. 374, 66 L.Ed.2d 228 (1980); *In re Investigation Before February, 1977, Lynchburg Grand Jury,* 563 F.2d 652 (4th Cir.1977) (attorneys disqualified because targets of investigation concerning activities in which clients were involved); *United States v. Clarkson,* 567 F.2d 270 (4th Cir. 1977) (attorney disqualified because under indictment for criminal activities related to client).

I can only assume that in each of these cases where the trial judge was held not to have abused his discretion, there was sufficient evidence in the record to support the district court's finding that the attorney should be disqualified. In each case the order of disqualification was the subject of an appeal based upon a record developed below. Here, of course, we have no such record. We have only the equivocal scraps of evidence to which I have referred above. No hearing has ever been held. No district court determination has ever been made. No charges have ever been brought.

*United States v. Crockett,* 506 F.2d 759 (5th Cir.), *cert. denied,* 423 U.S. 824, 96 S.Ct. 37, 46 L.Ed.2d 40 (1975), a case similar to this one, involved an attorney who had been active in the club where it was alleged illegal gambling had been conducted. He represented one of the defendants who had been charged with conspiracy in the operation of an illegal gambling business. The attorney was subpoenaed to testify at the trial of the defendant. When asked about gambling, the attorney pled the fifth amendment claiming that any evidence given might incriminate him (the attorney). The court of appeals, in holding that the defendant was not prejudiced either by the attorney's claim of privilege or by the attorney's subsequent testimony to the effect that gambling had taken place at the club, focused on the fact that neither the attorney's fear of self-incrimination nor the attorney's testimony incriminated the defendant. The court went on to comment on the obvious impropriety of the attorney's failure to withdraw from the case when he realized that he would be testifying as a prosecution witness, but did not analyze the issue in terms of conflict of interest.[4]

If it were not for the fact that James' stipulation is facially prejudicial to Zepp's interest, I would not have agreed with my colleagues to grant Zepp a new trial because I do not believe that James' purported conflict of interest is substantiated by the record of this case. Indeed, before any conflict of interest analysis could even take place in the circumstances of this case, it is clear that an evidentiary hearing should have been held so as to establish that, at the time James was in the Zepp house, glassine envelopes had yet to be discarded. Yet the majority, overlooking the two sets of flushings that took place, rejects the need for an evidentiary hearing and seeks to support its conflict of interest conclusion on a record that is totally ambiguous in this respect. On the other hand, no such evidentiary hearing is required if the analysis proceeds along the lines which I suggest, that of deficient representation, because the record is clear and unequivocal as to

---

4. Indeed, a later Fifth Circuit case in commenting on *Crockett,* analyzed the relevant sixth amendment issue in terms of adequacy of representation; *see Uptain v. United States,* 692 F.2d 8 (5th Cir.1982) discussed in text following.

the content of the stipulation into which James entered.

I do, however, find that by entering into the stipulation, James rendered an inadequate performance as Zepp's attorney, and in doing so, prejudiced her trial. It is for that reason, as I indicated earlier, that I would reverse Zepp's conviction. Thus, as I see it, the proper issue which this court should confront is not whether James' actions constituted a conflict of interest, but whether James denied Zepp her right to effective assistance of counsel when his stipulation was entered into the record at her trial.

## II.

In *Uptain v. United States*, 692 F.2d 8 (5th Cir.1982), the Fifth Circuit directly addressed the issue of an attorney giving evidence against his client. *Uptain* involved a bail jumping trial in which the government called the defendant's attorney, Kirby, to testify that he had given his client, Uptain, notice of the trial date. Kirby testified that he had sent two letters to his client informing him of the trial date. He also testified that he had discussed the trial setting with Uptain by telephone prior to trial and that his normal procedure would have been to inform his client of the trial date. During the trial, Kirby was cross examined by both Uptain and another attorney whom the court had appointed to represent Uptain during Kirby's testimony. Kirby made the defense's closing argument to the jury. Uptain was convicted.

The court analyzed the issue as one involving inadequate representation and concluded that Kirby's testimony violated Uptain's sixth amendment guarantee of the right to counsel. Recognizing the inherent problem of an attorney testifying against his client, the court emphasized that Kirby "could not possibly have been an effective advocate when the aim of his primary argument to the jury should have been to diminish the weight, if not the credibility, of his own testimony." *Id.* at 10. The court in *Uptain* explained that application of the sixth amendment guarantee of the right to

counsel "involves an inquiry as to whether counsel's actual performance, considered in light of the totality of circumstances in the case, was seriously inadequate and whether counsel's inadequacy prejudiced the fairness of his client's trial." *Id.*

It is apparent to me that our focus too must be on the question of whether James in this case inadequately represented Zepp when he entered into a stipulation which implicated her defense. If, as I suggest, our analysis must follow that employed in *Uptain,* then the dual test of *Strickland v. Washington,* —— U.S. ——, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) is implicated. In *Strickland,* the Supreme Court required that two predicate determinations must be made before a court can decide that a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient; and second, the defendant must demonstrate that the deficient performance prejudiced the defense. 104 S.Ct. at 2064.

Zepp clearly satisfies the deficiency prong of the *Strickland* analysis. In *Strickland* the Court explained that an attorney's performance is deficient if it is unreasonable under "prevailing professional norms." 104 S.Ct. at 2065. The prevailing rules of trial advocacy, as set forth in the Model Code of Professional Responsibility, require an attorney to withdraw as counsel when it appears that his testimony might be prejudicial to his client. Model Code of Professional Responsibility DR 5–102 (B), *see also United States v. Crockett, supra,* at 760–61. James unquestionably had a duty to withdraw, and upon his failure to do so, his continued defense of Zepp cannot be regarded as other than deficient.

*Strickland* also holds that where the defendant alleges a deficiency in attorney performance, the defendant must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 104 S.Ct. at 2068. In this case, not only was Zepp prejudiced

by the fact that James testified against her by his stipulation, but the record indicates that James also denied Zepp the benefit of the exculpatory evidence contained in his proposed stipulation. While negotiating the language of the stipulation read to the jury, James also proposed to stipulate that at no time while he was in the house was the bathroom used.[5] James, however, withdrew the second stipulation. The record does not disclose why the proposed stipulation was withdrawn. If the jury had not been convinced that the police had heard a second series of toilet flushings, and had James testified or stipulated that the bathroom had not been used while he was in the house, the jury's verdict may well have been different.[6] If, however, we consider the scenario at time of trial with the stipulation that was given by James, i.e., that it was only James who had not used the bathroom, the prejudice to Zepp is apparent.

In my opinion, James' stipulation, inadvertent or otherwise, constitutes evidence from which the jury could have inferred that Zepp was guilty of possession of cocaine (Count III) and/or destruction of evidence (Count V). This is sufficient in my judgment to require that a new trial be ordered under the circumstances of this case where there was little other evidence to link Zepp to these charges. Here, as in *Uptain, supra,* I conclude that there was ineffective assistance of counsel, because James' performance was "seriously inadequate" and the "inadequacy" prejudiced the fairness of Zepp's trial. See *Uptain,* 692 F.2d at 10.

### III.

I have gone to some length, however, to question the majority's conflict-of-interest analysis because I do not believe that on a record such as this one, it is appropriate to accuse attorney James of incriminating his own client to save himself from charges of criminal complicity. The professional and personal consequences of such labeling can be dire, and as I have pointed out, I think the present record cannot support any such conclusion.

Indeed my reading of the testimony of the suppression hearing where James' stipulation first evolved, indicates to me that it was more a thoughtless than a calculated stipulation to which James had agreed. A fair reading of that testimony indicates to me that James' sole endeavor at that time was not to curry the government's favor or seek to prevent the government from looking to him as a co-conspirator or as a potential criminal defendant, but was rather to remain as Zepp's counsel in the case. Regardless of James' intention, however, the effect was, in my opinion, so prejudicial to Zepp's case that her conviction must be set aside. Yet, in granting her a new trial, I do not think we should strain to find a conflict of interest where none appears.

This is particularly so when there is a ready analysis to test the kind of problem that has been presented to us. I refer, of course, to the concept of inadequate or deficient assistance of counsel. To me,

---

5. THE COURT: All right; the stipulation: At no time when he was in the house were any of the bathrooms used by him.

   ATTORNEY JAMES: *I would like to make a further stipulation that at no time I was in the house was the bathroom used.*

   Would you agree to that?

   THE COURT: Now I think we better take a recess to see if you want to testify.

   ATTORNEY JAMES: If he doesn't want to stipulate, I'll withdraw it.

   To the first one, not the second one.

   Okay; you won't stipulate.

   THE COURT: Let me now so there will be no misunderstanding on the record understand that Mr. James, that you stipulate that at no time while you were inside the resi-

dence at 38 Little Fountain was the bathroom used by you.

   ATTORNEY JAMES: That is correct, sir; I so stipulate.

(App. at 114–115) (emphasis added).

6. I do not suggest that James should have been both a witness and trial counsel even where his testimony may have been exculpatory. I point out only that if the true fact was that neither James nor Zepp flushed the toilet while only the two of them were in the house, and James' testimony could establish that fact, that testimony should not have been denied to Zepp in favor of her continued representation by James.

James' action should be judged not according to whether he had some hypothetical or speculative motive to avoid criminal liability, but whether his performance was deficient or inadequate, and if so, whether prejudice resulted to his client. That is, whether it is reasonably probable that absent James' actions—actions about which no speculation is needed [7] because they are clearly reflected in the record—a different outcome of Zepp's trial would have resulted. I am satisfied that it would have.

It is for that reason, and that reason alone, and because the record supports such an analysis, that I would reverse Zepp's conviction.

**7.** We need not speculate about James' performance on the part of Zepp because the stipulation into which James entered is not challenged and appears in full in the suppression hearing to which both the majority opinion and I have referred.