Anthony MORELLI, Petitioner,

v.

UNITED STATES of America, Respondent.

Civ. No. 00–4853 (WGB).

United States District Court, D. New Jersey.

Sept. 5, 2003.

**456**

Marc Fernich, Esq., Law Office of Marc Fernich, New York, NY, for Anthony Morelli.

Aidan P. O'Connor, Assistant U.S. Attorney, Christopher Christie, United States Attorney, U.S. Department of Justice, Newark, NJ, for the United States.

### OPINION

BASSLER, District Judge.

This matter comes before the Court upon the Petition by Anthony Morelli to vacate his conviction pursuant to 28 U.S.C. § 2255. In 1995, Morelli and other defendants were charged, tried and, following a five-month trial before this Court, convicted for participating in a "daisy chain" scheme to evade excise taxes on the sale of fuel. At trial, the prosecution established that Morelli was a captain of the Gambino crime family who supervised a group of Gambino mob members in extorting a "mob tax" from the bootleg sales of motor fuel. *United States v. Morelli*, Crim. No. 93–210, unpublished slip op. at 4 (D.N.J.

Feb. 26, 1996), *aff'd*, 169 F.3d 798 (3d Cir.1999). The jury found Morelli guilty of participating in a RICO conspiracy, extortion, wire and mail fraud and money laundering. *Id.* at 4–5. Morelli was sentenced to 240 months in prison.

Morelli filed his § 2255 motion on October 4, 2000. The Court held a three-day evidentiary hearing on Morelli's § 2255 motion in December 2002 ("the Hearing").[1] In support of his motion, Morelli argues that the Court should vacate his conviction and grant him a new trial because:

> (a) the government suppressed vital *Brady* material regarding the illegal arrest and "extradition" of David Shuster, and (b) trial counsel Richard Rehbock suffered from a disabling conflict of interest—stemming from his simultaneous investigation by the Internal Revenue Service ("IRS"), the same agency that prosecuted Morelli—that adversely affected his representation.

(Pet. PH Br. at 1.)[2]

For the reasons set forth below, the Court finds that the undisclosed evidence, arguably both potentially favorable to the accused and within the constructive knowledge of the prosecution, was not material to Morelli's guilt or punishment. The Court therefore concludes that no *Brady* violation occurred and that neither vacation of Morelli's sentence and a new trial are warranted. The Court further holds that Morelli's Sixth Amendment Right to effective assistance of counsel was not violated.

### BRADY CLAIM

**I. Overview and Factual Background**

Morelli's *Brady* claim is rooted in "a vignette from the late Robert I. Fried-

---

1. The due dates for the motion briefs were repeatedly extended based on requests by the parties. The Hearing date was also repeatedly postponed in response to requests by defense counsel.

2. "Pet. PH Br." refers to Petitioner's Post-Hearing Brief.

man's book *Red Mafiya: How the Russian Mob Has Invaded America* (Little, Brown & Co.2000)" ("*Red Mafiya*"). (Pet. PH Br. at 2.) Morelli asserts that:

the government violated its disclosure obligations under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), by suppressing evidence that agents of the Federal Bureau of Investigation ("FBI"), in concert with Russian officials, unlawfully coerced key witness David Shuster into returning to the United States to participate in Morelli's prosecution.

(Pet. Br. at 2.) [3]

According to Friedman's account, in 1992, the first deputy minister of the interior of the Russian Federation, Mikhail Konstantinovich Yegorov, proposed a "cooperation agreement with American law enforcement to combat jointly the Russian mob." *Red Mafiya* at 86. Although the United States and the Russian Federation had no extradition treaty, the chief of the FBI's organized crime section, Special Agent James Moody, informed Yegorov that "[t]wo fugitives from [an FBI investigation code named] Red Daisy—David Shuster and an accomplice—were known to be hiding out in Moscow." *Id.* Moody allegedly urged Yegorov to "expel" Shuster and the other fugitive from Russia as undesirables. *Id.* at 87.

Friedman recounts that Russian Special Forces then captured Shuster, transported him "to a dense forest outside of Moscow, dumped [him] into a hole, and buried [him] up to his neck in gravel." *Id.* at 88. An FBI agent, Klaus C. Rohr, arrived in Russia to retrieve Shuster. According to Friedman's account, Rohr "was taken directly to Shuster" (presumably near the

hole in the Russian forest) and confronted him:

"We don't have any jurisdiction in Russia," Rohr told [Shuster], after identifying himself as an agent of the FBI. "But we're going to put you on a plane and take you back to the United States, and I'm going to arrest you once we get back to America. If you give me any problems, I'm going to leave you in the hole."

"No Problem," Shuster replied.

*Id.*

The evidence adduced at the Hearing, in the form of testimony by Rohr, Moody, and Friedman's wife, Christine Dugas, does not support Friedman's account in its entirety.

### A. *Rohr's Hearing Testimony*

Rohr credibly testified that he first encountered Shuster not in the forest near a hole, but when Russian police officers brought Shuster to the airport police headquarters in Moscow. (Dec. 9, 2002 Tr. at 88.) According to Rohr, Shuster was "disheveled" and "dirty." (*Id.* at 93.) Shuster told Rohr that he had not had a shower for several days, and that Russian prisoners do not receive showers until they have been incarcerated for two weeks. (*Id.* at 100.) Shuster did not mention any "hole" or "slit trench" in which he had been buried or otherwise confined. (*Id.* at 88, 97–98.) Rather, Shuster told Rohr that he had been incarcerated "in a cell with at least a dozen other people and there were sleeping accommodations for only three or four, and it was a fight who got the bed." (*Id.* at 98.) Shuster did not inform Rohr of any threats against Shuster made by any Russian or FBI authorities. (*Id.* at 101–02.) As far as Rohr was aware, Shus-

---

**3.** "Pet. Br." refers to Petitioner's Memorandum of Law in Support of his Motion to Vacate the Judgment.

ter agreed voluntarily to accompany him back to the United States.

### B. Moody's Hearing Testimony

Moody credibly testified that it was his "understanding" that Russian agents "dug a hole or slit trench," put Shuster in it, and guarded him. (*Id.* at 26.) Moody did not witness Shuster's arrest or detention by Russian authorities. Only after Shuster was returned to the United States, a Russian named Yuri Anatonovich Melnikov, who was Yegarov's aide and then head of Interpol, (*id.* at 43) told Moody that Shuster had been "held in a hole." (*Id.* at 41, 43.) Melnikov did not tell Moody, and Moody never heard from anyone else, that Shuster was "buried up to his neck" in the hole. (*Id.* at 25.) Melnikov also recounted to Moody that while Russian authorities were apprehending Shuster, a battle ensued during which there was an exchange of gunfire and Shuster was able to break two sets of handcuffs. (*Id.* at 24, 35.)

Moody never learned any other detail regarding Shuster's confinement. (*Id.* at 44.) Moody was never informed that any FBI agents threatened to leave Shuster in a hole in the forest unless he returned to the United States and cooperated in Morelli's prosecution. Thus, all Moody knew before and during Morelli's trial, was that, in apprehending Shuster, Russian agents had temporarily detained Shuster in a hole and that, in total, Shuster was in the custody of Russian agents "for two or three days" until he was retrieved by FBI Agent Rohr. (*Id.* at 44.)

Since his retirement from the FBI, Moody has maintained business relations with Melnikov as a private investigator and security consultant. (*Id.* at 47.) On December 6, 2002, after Morelli's conviction but three days before the Hearing on Morelli's § 2255 motion, Moody and Melnikov spoke on the telephone about unrelat-

ed business matters. During this conversation, Melnikov told Moody that Shuster was not put into a hole, but rather into a "slit trench." (*Id.* at 52.) Moody did not inquire into the dimensions or conditions of the slit trench (*id.* at 53) and was not aware of any information suggesting that any FBI or other American agent kidnapped or tortured Shuster. (*Id.* at 58.)

### C. Dugas's Hearing Testimony

Dugas, Friedman's widow, likewise did not witness the capture and detention of Shuster. Friedman died in July 2002, between the filing of Morelli's Petition and the Hearing. (*Id.* at 63.) At the Hearing, Dugas testified as to her recollection of taped interviews and conversations with Moody that occurred sometime in 1999 while fact-checking for her husband's book. (*Id.* at 64.) According to Dugas, Moody told her that Russians "had taken [Shuster] to the woods, stuck him in a hole and covered him up." (*Id.* at 69.) Dugas was not able to find any of the transcripts or tapes of interviews with Moody. (*Id.* at 66–67.)

## II. Analysis

Under 28 U.S.C. § 2255, a prisoner in federal custody may bring a motion before the trial court attacking the validity of his sentence. The prisoner has the right to be released if the sentence (1) was imposed in violation of the Constitution or laws of the United States; (2) was imposed by a court lacking jurisdiction; (3) was in excess of the maximum authorized by law; or (4) is otherwise subject to collateral attack. 28 U.S.C. § 2255.

 A petitioner is only entitled to habeas corpus relief under limited circumstances. The petitioner must establish that the sentence suffers from "a fundamental defect" causing "a complete miscarriage of justice" or "an omission inconsistent with the rudimentary demands of fair

procedure." *United States v. DeLuca*, 889 F.2d 503, 506 (3d Cir.1989), *cert. denied*, 496 U.S. 939, 110 S.Ct. 3222, 110 L.Ed.2d 669 (1990)(citing *Hill v. United States*, 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962) and *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir.) (in banc), *cert. denied*, 444 U.S. 865, 100 S.Ct. 135, 62 L.Ed.2d 88 (1979)).

### A. Elements of a Brady Violation

■ In *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the Supreme Court held:

[T]he suppression by the prosecution of evidence favorable to an accused ... violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* To demonstrate a *Brady* violation and obtain a new trial based on the suppression of evidence favorable to the accused, the defendant must therefore show that (1) the government suppressed evidence (2) favorable to the defense and (3) material to guilt or punishment. *Moore v. Illinois*, 408 U.S. 786, 794–95, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972).

■ To establish a *Brady* violation, the defendant need not demonstrate that the prosecutors were personally aware of undisclosed *Brady* material:

[R]egardless of whether the omission was intentional or a product of bad faith, the defendant is entitled to a new trial— or, if pertinent, a new penalty phase— provided that the withheld materials were material to guilt or innocence or to punishment.

*Marshall v. Hendricks*, 307 F.3d 36, 52 (3d Cir.2002). Because *Brady* held that even unintentional ("good faith") failures to disclose can deprive a defendant of the due process required by the Fifth Amendment, the prosecutors have the burden of producing all material evidence within their actual or constructive possession. *See Kyles v. Whitley*, 514 U.S. 419, 437, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)(discussing government's "degree of discretion" and "corresponding burden" in turning over all material, favorable evidence).

In *Kyles*, the Court explained the prosecution's affirmative duty to seek out information favorable to the accused from certain sources. The Court stated:

[T]he individual prosecutor has a duty to learn of any *favorable evidence known to the others acting on the government's behalf* in the case, including the police. ... [T]he prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable.

*Id.* (emphasis added). Thus, if the individual prosecutors are personally ignorant of favorable, material evidence known by one or more agents acting on the prosecution's behalf, the prosecutors "should know" of the evidence and will be deemed to have "constructive knowledge" of the *Brady* materials. *United States v. Joseph*, 996 F.2d 36, 39–40 (3d Cir.1993).

■ In *Giglio v. United States*, 405 U.S. 150, 154, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972), the Court held that certain impeachment evidence constitutes *Brady* material. Impeachment evidence is exculpatory evidence when it affects the credibility of a witness whose "reliability" "may well be determinative of guilt or innocence." *Id.* To be *Brady* material, the impeachment evidence, like any other type of favorable evidence, must still be "material" under *Brady*. *Id.* Generally, any evidence, impeachment or otherwise, "is favorable to the accused under *Brady* 'if it would tend to exculpate him or reduce the penalty....'" *Smith v. Holtz*, 210 F.3d 186, 195 (3d Cir.2000)(quoting *Brady*, 373 U.S. at 87–88, 83 S.Ct. 1194 (1963)). For *Brady* purposes, therefore, impeachment evidence is not "constitutionally different

from exculpatory evidence," because "if disclosed and used effectively [impeachment evidence] may make the difference between conviction and acquittal." *United States v. Bagley*, 473 U.S. 667, 676–677, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

■ Finally, favorable evidence is "material" if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles* at 435, 115 S.Ct. 1555. The Court summarized materiality in *Kyles* as follows:

> [The] touchstone of materiality is a "reasonable probability of a different result, and the adjective is important." The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trail, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."

*Kyles*, 514 U.S. at 434, 115 S.Ct. 1555 (quoting *Bagley*, 473 U.S. at 667, 105 S.Ct. 3375).

## B. *The Government's Failure to Disclose that Shuster Had Purportedly Been Held in Hole in Russia Does Not Constitute a Brady Violation*

### (1) *The Evidence Constructively Known by the Government*

■ Morelli contends that the government suppressed evidence that:

the Russian police—at the instance and on behalf of the FBI—arrested Shuster by extra-judicial means and confined him in a dirt hole for days, until he allegedly "agreed" to come to the United States and eventually to cooperate against Morelli.

(Pet. PH Br. at 5–6.) Morelli also asserts the prosecution had constructive knowledge of such evidence because "Moody and Rohr plainly were law enforcement agents 'acting on the government's behalf in the case.'" (Pet. PH Br. at at 7, citing *Kyles*, 514 U.S. at 438, 115 S.Ct. 1555.) [4]

As summarized above in Part I, however, the credible testimony at the Hearing established that (1) Rohr knew nothing of any story about Shuster's confinement in a hole in a Russian forest and (2) Moody heard, as related to him by Melnikov, that Shuster was "held in a hole" by Russian authorities for some amount of time during the three-day period before Shuster was transferred to Agent Rohr at the Moscow airport. Moody did not know, however, nor is there *any* evidence to suggest (other than the few sentences in *Red Mafiya*), that the Russian police who arrested Shuster used "extra-judicial means" (Pet. PH Br. at 5), or that Shuster was buried up to his neck in gravel, threatened, or coerced in any way to provide the incriminating testimony against Morelli. [5]

Besides the evidence adduced at the Hearing, other evidence in the record of this case discredits the *Red Mafiya* account. First, Shuster himself denies the story. (*See* Shuster Aff., Resp. Ans., Ex. 2.) Shuster states in his affidavit:

---

4. It is undisputed that the government prosecutors assigned to Morelli's case, including the two Assistant United States Attorneys, the FBI case agent and the IRS case agent, personally knew nothing about Shuster's detention in a hole in Russia, nor anything about the assertions contained in *Red Mafiya* that Shuster was threatened or buried up to his

neck in gravel. (*See* Affidavits of Depew, Fredrick, Flynn and Stahl, Resp. PH Br., Exs. A–D.)

5. The Court notes that not even *Red Mafiya* suggests that Russian or U.S. authorities threatened or coerced Shuster to mold his testimony to the government's wishes. For instance, the *Red Mafiya* states:

I was not "taken to a forest and buried up to [my] neck in a hole. FBI agents did not threaten to leave me in the forest, in a hole or anywhere else if I did not agree to 'voluntarily' return to the United States and participate in the prosecution of Morelli." ... I have read the book entitled *Red Mafiya: How the Russian Mob Has Invaded America* [,] written by Robert I. Friedman[,] where this claim is set forth. The author never talked to me about my arrest and the story set forth in this book regarding my arrest is not true.

(*Id.*) In response to Morelli's motion papers, the government submitted Shuster's sworn affidavit in 2001, approximately two years before the Hearing. Sometime over the past two years, Shuster, who is not a United States citizen, left the United States and, despite the government's diligent efforts, could not be located or produced for the Hearing. (Resp. Br. at 9 and Exs. A–D, Affidavits of Depew, Frederick, Flynn and Stahl.)

Furthermore, at Morelli's trial, in response to questions about his arrest and return to the United States, Shuster did not mention any detention in a hole. (Pet. PH Br. at 11, citing Trial Tr. at 1783–84, 1903–11, 1927.) In April 1993, while in Moscow and making frequent "business" trips to Europe, Shuster learned that the United States authorities had issued a warrant for his arrest. (Jan. 13, 1995 Tr. at 1904.) Shuster testified that he was

arrested in Moscow on June 16, 1993 and "was returned back to the United States" three days later, on June 19, 1993, (Jan. 12, 1995 Tr. at 1784), where he remained in federal custody through Morelli's trial. (Jan. 13, 1995 Tr. at 1911.)

When the prosecution asked Shuster what happened after the Russian authorities arrested him, Shuster responded that the Russian authorities "took him over to FBI in Moscow." (Jan. 12, 1995 Tr. at 1783.) Shuster explained that he was reunited with another fugitive, Belokopytov, in an airport when Russian authorities transferred Belokopytov and Shuster "to the FBI agent." (Jan. 13, 1995 Tr. at 1926.) Shuster's trial testimony indicates that Russian authorities transferred Shuster to FBI agent Rohr and supports Rohr's testimony that he first encountered Shuster not in the forest near a hole, as the *Red Mafiya* vignette suggests, but when Russian police officers brought Shuster to the airport police headquarters in Moscow. (Dec. 9, 2002 Hearing Tr. at 88.)

In addition to the Shuster Affidavit and trial testimony, the Court finds that Moody's Hearing testimony thoroughly and independently discredits the *Red Mafiya* account. The Court finds Moody's testimony at the Hearing to be more reliable than the brief and disputed account in *Red Mafiya*, which was itself purportedly based on Friedman's and Dugas's interviews with Moody. Absent tapes or transcripts of the interviews, the Court cannot discount credible testimony by a person

---

[T]o solidify the [Red Daisy] case, the prosecutors still needed members of the criminal enterprise to cooperate and so they offered Shuster a deal he couldn't refuse: if he agreed to testify against members of the massive bootlegging conspiracy, he would be given a letter that promises to petition the judge for leniency at sentencing as a reward for cooperation.
*Red Mafiya* at 90. Thus, while *Red Mafiya* incorrectly asserts that Rohr threatened to

leave Shuster in the hole if Shuster "gave [Rohr] any problems," the book does not suggest that anyone threatened to leave Shuster in the hole unless he provided incriminating testimony against Morelli. Shuster's plea agreement with the prosecutors regarding his recommendation for a more lenient sentence, moreover, *was* disclosed to the defense. (Resp. Br. at 9.)

who is the source of a book's factual assertions in favor of the second-hand source. The Court concludes that the *Red Mafiya* account is not credible because it conflicts with the credible testimony provided at the Hearing and is not supported by any other sources.[6]

The testimony of Moody and Rohr persuades the Court that the statement in *Red Mafiya* that Shuster was "buried up to his neck in gravel," *Red Mafiya* at 88, is unsupported by credible evidence. The Court finds credible Rohr's testimony that he did not meet Shuster in a forest, but at airport police headquarters in Moscow, and that Rohr never threatened to leave Shuster in a hole if Shuster gave Rohr "any problems." *Id.*

The Court concludes that Morelli has failed to establish the existence of the evidence that he claims the government suppressed. In other words, the Court is not convinced of the truth of the *Red Mafiya* account. There is also no evidence that the Russian forces used "extra-judicial" or "illegal" means, whether at the FBI's request or not, in arresting Shuster in Moscow: neither Russian nor international law would necessarily be violated if Russian police temporary confined in a hole a known fugitive who had been engaging in criminal enterprises in Russia and who had just participated in a gun battle with Russian authorities.

(2) *While the Evidence Constructively Known by the Government Could Constitute Favorable Impeachment Evidence, It Is Not Material Under Brady*

■ It is questionable whether the mere fact that Moody had been told that Shuster had been "held in a hole" in Russia constitutes favorable impeachment evidence. Shuster would not necessarily have affirmed this fact on cross-examination, considering his trial testimony and the denial in his affidavit.

In addition, the three avenues of impeachment suggested by Morelli are unconvincing. First, it is doubtful that the fact or possibility that Shuster was held in a hole in Russia would have suggested to the jury that Shuster had a motive to lie out of either gratitude to the prosecution for freeing him from the hole or out of fear of being returned to the hole. (*See* Pet. PH Br. at 10.) Second, the idea that the jury would have disregarded the other incriminating evidence against Morelli, in the form of the testimony of another government witness (Dougherty) and concluded that the entire prosecution lacked good faith and integrity, stretches the bounds of credulity. Finally, the Court finds that the knowledge that Shuster may have been, or was, held in a hole would not have led the jury to conclude that the government had gone to extraordinary lengths to secure Shuster's testimony because the government "knew it had no case against [Morelli] in Shuster's absence" and that the government lacked sufficient evidence to implicate Morelli in the money laundering conspiracy. (*Id.* at 11.)

For purposes of its analysis, however, the Court assumes "the dubious proposition" that Moody's awareness that Shuster was held in a hole in Russia constitutes "evidence favorable" to Morelli and constructively known by the prosecution.

---

**6.** The government also correctly notes that *Red Mafiya* is demonstrably unreliable in other sections, such as those purporting to quote the Morelli trial transcript. Certain passages in quotation marks differ from the official trial transcript and also incorrectly identify the prosecutor questioning the witness. (Resp. PH Br. at 7 (citing *Red Mafiya* at 92–93 and February 2, 1995 Trial Transcript, at 4132, *et seq.*)).

*United States v. Hill,* 976 F.2d 132, 135 (3d Cir.1992).

Morelli argues that the evidence potentially impeaching Shuster meets the third materiality requirement of *Brady* because Shuster was one of only two government witnesses "to implicate Morelli directly in the charged conspiracy" and supplied "pivotal" incriminating testimony. (Pet. PH Br. at 8.) The Court agrees that Shuster's testimony was important to Morelli's conviction and sentence. Viewed along with the other evidence adduced at trial, however, including the other impeachment evidence about which Shuster was vigorously cross-examined, the undisclosed evidence is not material. Evidence that Shuster was detained in a hole by Russian authorities does not "put the whole case in such a different light as to undermine confidence in the verdict." (*Id.* at 435.)

Morelli's lawyer, Richard Rehbock, along with counsel for co-defendant Gregory Federico, vigorously cross-examined Shuster for four days, questioning Shuster about prior criminal activity and his deal with prosecutors for a recommendation of a lesser sentence in exchange for his testimony against Morelli. (Resp. Br. at 8–11.) Rehbock attempted to impeach Shuster by asking him about instances including a prior fuel scam conviction and tax fraud indictment, allegations that Shuster had attempted to hide from United States authorities in Russia, and that he had committed theft, narcotics trafficking and murder. (*Id.* at 9, 11.)

The materiality of the evidence would be undeniable if Morelli had established that the government secured Shuster's presence at trial and his testimony "through threats of death." (Pet. Br. at 12.) The evidence here, however, was that Shuster was temporarily detained in a hole by Russian authorities until he was brought to meet FBI agent Rohr at the Moscow airport. Such evidence, if known by the defense, would not give rise to "a reasonable probability that the result of the trial would have been different." *United States v. Pflaumer,* 774 F.2d 1224, 1230 (3d Cir. 1985). Certainly, any detention of Shuster in a hole in Russia renders his testimony no more suspect, and Morelli's guilty verdict no more untrustworthy, than Shuster's horrendous criminal past and deal with prosecutors for a recommendation of a more lenient sentence.

The Court concludes that vacation of Morelli's conviction and a new trial are not required under *Brady* because there is not a reasonable probability that the undisclosed evidence would have led to a different outcome.

## SIXTH AMENDMENT CLAIM

### I. *Overview and Factual Background*

Morelli argues that his conviction should be vacated because of a violation of his Sixth Amendment right to effective assistance of counsel. According to Morelli, an actual conflict of interest adversely affected Morelli's representation by his trial attorney, Richard Rehbock. The alleged conflict of interest, allegedly unknown to Morelli, arose from the fact that Rehbock was under investigation by the IRS for financial improprieties that "culminated in a tax evasion plea." (Pet. Br. at 2.)

From 1992 through 1995, during his representation of Morelli:

> Rehbock underwent a messy and highly publicized divorce in which his wife accused him of serious financial improprieties—including failure to report sizable cash payments from reputed organized crime figures—and sent his financial records to a slew of federal authorities.... The IRS later used those records to charge Rehbock with tax evasion.... Finally, in 1997, Rehbock

pleaded guilty to felony tax evasion in the Southern District of New York based on his failure to report earned income for the calendar year 1992. (Pet. PH Br. at 15–16.) As early as 1992, Rehbock was "alerted to the fact" that IRS agents were "investigating" him because they sat in the courtroom to monitor his divorce proceedings and began calling his business associates and friends to inquire about him. (Dec. 13, 2002 Hearing Tr. at 15–16.) Rehbock had no formal notice of any investigation until the IRS approached him in 1997. (*Id.* at 16.) Until 1997, Rehbock "was hoping" that the IRS would not pursue any civil or criminal investigation. (*Id.* at 36.)

Morelli claims that the IRS's investigation of Rehbock "dissuaded Rehbock from cross-examining [IRS] agents whose 'loss' testimony swelled Morelli's sentence." (*Id.*) Morelli explains that "because the IRS was weighing an indictment of Rehbock, he had a natural 'incentive'—deliberate or unconscious—'not to want to anger ... [the IRS] agency.'" (Pet. PH Br. at 19, quoting Dec. 11, 2002 Hearing Tr. at 13 (testimony of Nicholas Gravante, Jr., an attorney who represented a codefendant of Morelli and later joined Morelli's defense team).)

Although Morelli was aware of Rehbock's divorce ordeal and potential problems he might have with the IRS, Rehbock never notified Morelli of a potential conflict of interest or its possible ramifications, or obtained a formal waiver of the alleged conflict. (Dec. 11, 2002 Tr. at 57–58; Dec. 13, 2002 Tr. at 22.)

## II. *Analysis*

In *United States v. Gambino*, 864 F.2d 1064, 1069 (3d Cir.1988), the Court of Appeals for the Third Circuit discussed a defendant's right to conflict-free representation:

The Sixth Amendment guarantee of effective assistance of counsel includes two correlative rights, the right to adequate representation by an attorney of reasonable competence and the right to the attorney's undivided loyalty free of conflict of interest.

*Id.*

■ To prevail on a potential conflict claim, a petitioner must show:

both that counsel's conduct fell below an objective standard of reasonableness and that but for this deficient conduct, the result of the trial would have been different, under the familiar standard established by *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

*Armienti I*, 234 F.3d at 824. In other words, to be entitled to a new trial, the petitioner must establish that a potential conflict resulted in prejudice at his trial. *United States v. Levy*, 25 F.3d 146, 152 (2d Cir.1994) (citations omitted).

In *Sullivan v. Cuyler*, 723 F.2d 1077, 1086 (3d Cir.1983)("*Sullivan II*"), the court described an actual conflict of interest as follows:

actual conflict of interest is evidenced if, during the course of the representation, the defendants' interests diverge with respect to a material factual or legal issue or to a course of action. This conflict must cause some lapse in representation contrary to the defendant's interests but such lapse need not rise to the level of actual prejudice.

*Id.* (citations omitted). Reversal of a conviction is only warranted if the petitioner demonstrates that the actual conflict caused a "lapse in representation," *id.*, or "adversely affected the attorney's performance." *Levy*, 25 F.3d at 152.

In *Sullivan II,* the court dealt with the more typical case of alleged attorney conflict of interest involving the representation by one attorney of multiple clients. *Government of the Virgin Islands v. Zepp,* 748 F.2d 125, 135 (3d Cir.1984). The "critical inquiry," however, "is whether counsel 'actively represented conflicting interests'". *Id.* (quoting *Cuyler v. Sullivan,* 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980)("*Sullivan I* ")). Thus, an actual conflict arises not only when counsel represents multiple defendants with divergent interests, but also when counsel himself has "personal interests" that are "inconsistent, diverse or otherwise discordant with those of his client and which affected the exercise of his professional judgment on behalf of his client." *Zepp,* 748 F.2d at 135 (quotation omitted).

To establish an actual conflict and its adverse effect, the petitioner must show that the attorney failed to pursue "some plausible alternative defense strategy or tactic" that "was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." *Gambino,* 864 F.2d at 1070 (quotation omitted).

### A. *Morelli Has Not Shown that Rehbock Had a Potential or Actual Conflict of Interest that Prejudiced or Adversely Affected his Representation of Morelli*

Morelli argues that Rehbock's "concurrent investigation by the agency prosecuting Morelli mired [Rehbock] in at least a potential, if not actual, conflict of interest." (Pet. PH Br. at 18.) The cases cited by Morelli, and the arguments set forth in the briefs in support of his motion, however, focus on actual, rather than potential conflicts. Morelli analogizes his case explicitly to *Levy* and *Armienti I.*

In *Levy,* the court found defendant's attorney to have an actual conflict of interest under circumstances significantly more stark than those of Morelli's case. The attorney in *Levy* (1) had a joint representation conflict; (2) was being prosecuted on unrelated criminal charges by the same office prosecuting the defendant; and (3) may have played a role in a codefendant's flight. *Levy,* 25 F.3d at 156. The Second Circuit recognized that each one of these three situations could give rise to an actual conflict. *Id.*

The petitioner-defendant argued that based on these three conflicts, his attorney did not pursue the plausible alternative defense strategy of "try[ing] to pin greater culpability" on the codefendant whom the attorney still represented. *Id.* at 157. The court concluded that the petitioner had sufficiently demonstrated adverse effect by showing that the attorney's conflicts "prompted him to forgo [that] viable line of defense." *Id.* at 158. Due to the three actual conflicts, the court reasoned that a "complete exploration" of the codefendant's "role in the underlying drug offenses" would have forced the attorney:

> to risk (1) breaching his legal and ethical obligations to [the codefendant] as his client, (2) uncovering [the attorney's] own possible misconduct from his role in [the codefendant's] flight, and (3) exposing himself to being called as a witness during [the defendant's] trial.

*Id.* at 157–158.

In addition to *Levy,* Morelli quotes from *Armienti I,* in which the court found that an evidentiary hearing was necessary to determine whether the attorney had an actual conflict that adversely affected his performance. *Armienti I,* 234 F.3d at 825. During the trial, the attorney "was being criminally investigated by the same United States Attorney's office that was prosecuting" the defendant. The Second Circuit found that:

[a] lawyer in these circumstances, while dealing on behalf of his client with the office that is prosecuting him personally may, consciously or otherwise, seek the goodwill of the office for his own benefit. A lawyer's attempt to seek the goodwill of the prosecutor may not always be in the best interest of the lawyer's client.

*Id.*

On appeal after remand, however, the Second Circuit affirmed the trial court's denial of petitioner's Sixth Amendment claim. At the evidentiary hearing, the defendant "failed to demonstrate" that the trial attorney "was influenced by any alleged ties to the Gambino family or by the pending investigation" by the prosecutor. *Armienti II,* 313 F.3d at 814.

All the other cases cited involving actual conflicts of interest comparable to Rehbock's are likewise distinguishable from this case. *See Zepp,* 748 F.2d at 136 (trial counsel (1) could have been indicted for the same charges on which he represented defendant and (2) was a witness for the prosecution); *see also United States v. McLain,* 823 F.2d 1457, 1464 (11th Cir.1987)(attorney refused to engage in plea negotiations with government in order to lengthen trial and delay attorney's own indictment for criminal conduct by same U.S. Attorney's office conducting defendant's trial).

### (1) *Rehbock Had No Potential Conflict*

Although Morelli argues that Rehbock represented Morelli while under "at least a potential, if not actual, conflict of interest," (Pet. PH Br. at 18), Morelli does not explain how Rehbock's situation could constitute a "potential" conflict of interest. If, as Morelli contends, Rehbock "consciously or otherwise" was in a position to "seek the goodwill" of the IRS at the expense of

Morelli's defense, *(Id.),* then the conflict by definition would be actual and not merely potential. The Court concludes that Rehbock did not labor under any potential conflict of interest.

### (2) *Morelli Has Not Established Prejudice*

Morelli asserts that:

[his] chances for acquittal depended largely on impeaching the credibility of the IRS agents who testified about, *inter alia,* the undercover fuel operation, their dealings with Morelli's coconspirators, and conversations with Dougherty and other defendants.

*(Id.* at 18–19 (quotations omitted).) As evidence of the "actual conflict," Morelli points to the fact that Rehbock "entirely failed to cross-examine the [IRS] agents" who testified at Morelli's trial, including Agent Paul Malloy, "whose testimony drove Morelli's money laundering liability and 20 year sentence." *(Id.* at 19–20 (emphasis omitted).)

Rehbock testified at the Hearing that his decision to forgo cross-examination of certain IRS agents was based on strategic considerations. First, Rehbock did in fact cross examine Agent Malloy after co-counsel for other defendants had cross examined him. (Resp. PH Br. at 16.) Second, there was no need for Rehbock to rehash the topics already covered by other co-counsel, considering that "Malloy's testimony dealt primarily with the amount of tax loss through the Daisy Chain schemes," and Morelli's position was that he was ignorant of the schemes. *(Id.)*

The Court concludes that Morelli has failed to show that the result of his trial was prejudiced by Rehbock's decision to forgo cross examination of some IRS agent witnesses. In response to the government's explanation of the tactical reasons

for Rehbock's defense strategy, Morelli still offers no:

> plausible explanation as to how additional cross examination would have affected the testimony of the IRS revenue agent regarding the amount of tax loss and the amount of money laundered during the conspiracy.

(*Id.* at 13.) The Court is unconvinced that additional cross-examination of IRS agents would have altered the outcome of the Morelli's trial.

### (3) *Rehbock Had No Actual Conflict*

■ The Court is also unconvinced that Rehbock suffered from an actual conflict of interest. It would be absurd for Rehbock to have assumed that by foregoing zealous advocacy on behalf of his client, he could somehow curry favor with IRS witnesses, who would, in turn, prevent or alter any future indictment by the IRS.[7] The IRS investigation of Rehbock was in its preliminary stages and completely separate from the Morelli trial. Rehbock himself testified that he still hoped the IRS would not bring formal charges. Nevertheless, regardless of whether or not Rehbock cross-examined witnesses at Morelli's trial, the IRS would not forgo a criminal investigation or decide not to file unrelated tax-evasion charges against Rehbock.

The Court concludes that Rehbock's personal interests (avoiding a tax evasion indictment) were not "inconsistent, diverse or otherwise discordant with" a full and thorough cross-examination of IRS agents at Morelli's trial. *Zepp*, 748 F.2d at 135 (quotation omitted). Put differently, a vigorous cross-examination of the IRS agents, even if in Morelli's strategic interest, was not "inherently in conflict with or not undertaken due to [Rehbock's] other loyalties or interests." *Gambino*, 864 F.2d at 1070 (quotation omitted).

### (4) *Any Actual Conflict, Even If It Existed, Did Not Adversely Affect Morelli's Representation*

■ Morelli has also failed to show that any actual conflict adversely affected his representation. As noted above, Morelli has not offered a convincing explanation as to how additional cross examination would have helped his case. Morelli has not laid out in any detail a "plausible alternative defense strategy or tactic." *Gambino*, 864 F.2d at 1070. Morelli's assertion that Rehbock could have conducted additional cross-examination is "not an alternative strategy with sufficient substance to be a viable alternative." *United States v. Morelli*, 169 F.3d 798, 811 (3d Cir.1999)(quotation omitted). Certainly, Rehbock's decision to forgo duplicative questioning of IRS agents when he believed that such questioning would not benefit Morelli does not demonstrate a "lapse in representation," *Sullivan II*, 723 F.2d at 1086, or in "professional judgment on behalf of his client." *Zepp*, 748 F.2d at 135.

### CONCLUSION

For the reasons set forth above, the Court concludes that no *Brady* violation occurred and Morelli's Sixth Amendment right to effective assistance of counsel was not violated. Morelli is therefore not entitled to a new trial.

---

7. The Court again notes that the IRS did not formally notify Rehbock of any indictment until roughly two years after Morelli's trial.