NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 09-3195

———————

UNITED STATES OF AMERICA

v.

WILLIAM KING, M.D.,
Appellant.

———————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA
(D.C. Crim. Action No. 08-66)
District Judge:  Honorable Robert F. Kelly

———————

Submitted Under Third Circuit LAR 34.1(a)
June 11, 2010

———————

Before: AMBRO, CHAGARES, and GREENAWAY, JR., Circuit Judges

(Opinion Filed: July 27, 2010)

———————

OPINION

GREENAWAY, JR., Circuit Judge.

Appellant Dr. William King ("King") appeals from the judgment of the District

Court for the Eastern District of Pennsylvania, following a jury trial, in which he was

convicted of thirteen counts of mail fraud, in violation of 18 U.S.C. §§ 1341 and 1342; fifty-nine counts of health care fraud, in violation of 18 U.S.C. § 1347; ten counts of false statements in a health care matter, in violation of 18 U.S.C. § 1035; and seventy-two counts of aiding and abetting, in violation of 18 U.S.C. § 2.

King's principal claim in this direct appeal is that his trial counsel was ineffective for failing to move to suppress evidence seized from King's home. King asks this Court to remand the matter for the District Court to entertain a motion to suppress. We find that this issue is not properly before this Court on direct appeal because the record has not been sufficiently developed to permit review at this time. We will therefore affirm.

## I. BACKGROUND

We write solely for the parties and recount only the essential facts.

King, a physician specializing in obstetrics and gynecology, was employed by the Health and Welfare Clinic (the "Clinic") in Philadelphia, Pennsylvania. The Clinic contracted with Local Union 33[1] to provide gynecological, as well as other medical, services to its members. Local Union 33 contracted with Independence Blue Cross ("IBC") to provide medical insurance to its members. King, like the other specialists at the Clinic, submitted claims through the mail to IBC. As part of the claim process, King assigned a billing code to each patient visit, describing services provided for that visit.

In 2003, through the use of a data mining computer program designed to detect

---

[1] Local Union 33 is a collection of labor unions in Philadelphia.

2

abuse and fraud, IBC became aware that King almost exclusively used CPT Code 99245 to describe the services he provided for each patient visit. Code 99245 signifies that the physician conducted a high-level consultation at the request of another physician.[2] As a result of this more detailed and lengthy consultation, Code 99245 generates a higher payment to the physician than other standard billing codes.

King's consistent use of Code 99245 created a statistical anomaly derived from the computer program. As a result, IBC initiated an audit of King's practice and requested access to forty patient files which King billed to Code 99245. King and his wife, who represented herself as his office manager, asked to postpone the audit and limit it to ten patient records. These requests were granted. The IBC auditors visited King's office on June 29, 2004 to conduct the audit.

The audit raised several red flags – the pristine condition of the ten original patient files produced, the lack of the required supporting documentation, and the appearance of only a single person's handwriting on each of the three pages in all of the files produced. The IBC auditors requested copies of additional patient records as points of comparison. When King sought to delay providing these records, IBC auditors referred the case to IBC's investigation department.

On August 14, 2004, two IBC investigators went to King's office and reviewed

_____

   [2] Among other requirements, Code 99245 requires a doctor to take a past medical history, a social history, and a family history of the patient, as well as conduct a comprehensive examination of the patient. This very thorough, high-level examination is expected to take approximately 80 minutes.

two files not provided before. Unlike the records previously provided, the records eventually obtained by the investigators contained one page per patient, instead of three pages, as well as handwriting from more than one person. These peculiarities induced IBC to refer King's case to the FBI. The case was assigned to an FBI agent and a United States postal inspector.

On February 18, 2005, two postal inspectors, two FBI agents, two IRS agents, and a CART examiner[3] arrived at King's home in Baltimore, Maryland to execute a search warrant, which authorized the seizure of medical files and billing documents, among other materials. During their search of the home, Carolyn King, Dr. King's wife and office manager, was present. The agents discovered five computers, each of which Mrs. King stated contained billing records. The agents presented four consent forms (one for each of four of the five computers) to Mrs. King, each of which she signed. The consent forms authorized the agents to conduct a complete search of those four computers. The FBI computer expert made an on-site forensic copy of those four computers' hard drives. Later on, the expert made an off-site copy of the fifth computer.[4]

The FBI computer expert discovered three templates of a three-page form on

---

[3] A CART examiner is an FBI computer expert, who is a member of a Computer Analysis Response Team, specializing in computer forensics.

[4] The fifth computer had to be copied off-site due to on-site technical difficulties. Mrs. King signed a property receipt for the fifth computer, which included a statement from Postal Inspector T. Ryan promising to return the computer in its original condition on February 22, 2005 (four days after the search).

4

King's computer, all created on June 6, 2004, two days after investigators requested patient records from King. These forms resembled the three-page forms that King had provided to IBC during the original audit of ten patient records.

At trial, on direct examination by King's attorney, Mrs. King testified that she had been shown what she believed was a search warrant, and that "based on what [she] reviewed, [she] agreed to let them search [her] home and to search [her] computers. . . ." (App. Vol. II at 102.) Then, on cross-examination by the Government, she testified that she was "never given a chance to read [the consent form] before [she] signed [it]. . .," and that she had been "tricked" and "deceived" because she was told that she "needed to sign those papers for inventory purposes." (App. Vol. II at 113-14.)

Although this is a direct appeal, King's only claim is ineffective assistance of counsel. Essentially, King's position is:

> During trial, Mrs. King testified that she was "tricked" into consenting to the Government's search of the computers in her home. In light of the relevant case law and Mrs. King's testimony, a serious question arose as to the legality of the Government's search of the computers, yet no argument to suppress the evidence on Fourth Amendment grounds was advanced prior to or during trial.
> In this appeal, Dr. King argues that the failure of his trial counsel to seek the suppression of the computer evidence was a prejudicial serious attorney error. The claim of ineffective assistance of counsel should be considered on direct appeal because there is no need for an evidentiary hearing on the question of trial counsel's error. The failure to seek suppression of the evidence could only have been an error and could not have been part of sound strategy because suppressing the evidence could have only helped the defense. Dr. King's remedy for his trial counsel's error should be entitlement to have this case remanded to the District Court for consideration of his Fourth Amendment claim.

5

(Appellant's Br. at 14.)

This matter is straightforward. Appellant seeks remand based on an issue (ineffective assistance of counsel) that is not appropriately before this Court given the present state of the record. Massaro v. United States, 538 U.S. 500 (2003); United States v. Thornton, 327 F.3d 268 (3d Cir. 2003). This deficiency cannot be overcome at this time. Appellant's sought-after relief must be denied, without prejudice to his ability to raise this issue in a motion filed pursuant to 28 U.S.C. § 2255.

## II. JURISDICTION

The District Court exercised jurisdiction pursuant to 18 U.S.C. § 3231. We exercise jurisdiction pursuant to 28 U.S.C. § 1291.

## III. ANALYSIS

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that (1) counsel's conduct was deficient or "outside the wide range of professionally competent assistance," and (2) that the deficiency resulted in prejudice to the defense such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 690, 694 (1984).

Our jurisprudence is clear – we do not review claims of ineffective assistance of counsel on direct appeal except under very narrow circumstances where there is clear evidence in the record of both deficient performance and prejudice requiring no further factual development. Thornton, 327 F.3d at 271-72; see also Massaro, 538 U.S. at 505

6

(holding that "ineffective-assistance claims ordinarily will be litigated in the first instance in the district court, the forum best suited to developing the facts necessary to determining the adequacy of representation during an entire trial")

The Supreme Court explained that district courts, unlike appellate courts, may take testimony from witnesses from both parties as well as from the counsel alleged to have rendered deficient performance, and that, without such factual development, a court is ill-equipped to make the highly fact-specific determination of whether counsel was ineffective and what, if any, prejudice resulted therefrom. See Massaro, 538 U.S. at 505; Thornton, 327 F.3d at 271-72 (quoting Massaro).

On direct appeal, the facts necessary to demonstrate the Strickland factors generally have not been developed. As Strickland is a conjunctive test, the lack of a factual record as to either the deficiency, or the prejudice prong, must cause an ineffectiveness claim to fail. Here, as is true in the typical trial, there are no facts addressing the attorney's decision-making process with respect to the strategic choice not to file a motion to suppress.

We have carefully considered King's argument that an adequate record exists allowing for immediate review, but are unpersuaded. There is no adequate record to judge trial counsel's alleged ineffectiveness. There are no circumstances evident here that meet the Thornton and Massaro test for review of ineffective assistance on direct appeal. In the absence of such circumstances, the appropriate action is to deny the appeal without prejudice to King's right to raise the claim of ineffective assistance of counsel in

7

an action brought pursuant to 28 U.S.C. § 2255.  Thorton, 327 F.3d at 272.

King contends that his counsel's omission was deficient because he knew or should have known prior to trial about the "alleged 'trickery' used to obtain [Mrs. King's] consent," and therefore he should have moved to suppress the computer evidence. (Appellant's Br. at 22.)  The record, however, lacks the information necessary for this Court to make such a determination.  The validity of Mrs. King's consent was not litigated below, and there is nothing in the current record to suggest that King's counsel had, or should have had, reason to anticipate what Mrs. King would reveal during her testimony.  In fact, it was not until the government's cross-examination of Mrs. King that she revealed that she believed she had been "tricked" into consenting to the search of the computers.[5]

During the investigation, Mrs. King had separate counsel and refused to testify before the grand jury on Fifth Amendment grounds.  Whether she cooperated with her husband's defense team during this period, and when, if it all, she began to cooperate with them is unknown.  Mrs. King was called to testify at trial by her husband's counsel. King's counsel, however, did not complete the exhibits Mrs. King was to testify about

---

[5]  During cross-examination of Postal Inspector Theresa Ryan, King's counsel asked if Mrs. King "thought you had deceived her" and that "you kind of tricked her into believing that you, in fact, had" a search warrant for the computers.  (Supp. App. 1124.) These questions might imply that King's counsel was aware of the possibility that Mrs. King's consent to search the computers was not voluntary, but these questions might also simply be part of defense counsel's standard cross-examination method.  Without further information, this Court's conclusions on this matter would be nothing more than conjecture.

until after the Government had rested, shortly before Mrs. King's testimony, during the defense case. This factual scenario leaves it unclear as to what King's counsel knew, or should have known, about the substance of Mrs. King's testimony before she took the stand.

King maintains, however, that even if his counsel was unaware of how Mrs. King would testify, he had a duty to move to suppress the computer evidence as soon as he became aware of her testimony during the Government's case-in-chief. Contrary to King's assertions, there is nothing in the current record to suggest that a motion, if made, would have been timely, or why his counsel failed to move to suppress, or why his counsel failed to object to the computer evidence, derived from the hard drive, that King now alleges was improperly obtained.

As a result, this Court has "no way of knowing whether a seemingly unusual or misguided action by counsel had a sound strategic motive or was taken because the counsel's alternatives were even worse." Massaro, 538 U.S. at 505 (citing Guinan v. United States, 6 F.3d 468, 473 (7th Cir. 1993)). For example, King's counsel may have had reason to believe that he would lose the suppression issue, or that he may have made a strategic choice to deprive the Government of preparation time. Possibly King's counsel knew the time for making such a suppression motion had run out long ago. See FED. R. CRIM. P. 12(b)(3)(C) (stating that a motion to suppress evidence must be made before trial).

The Government suggests that perhaps King's attorney believed he would lose the

9

suppression issue, "especially in light of Mrs. King's extensive education and general demeanor – which belied any naivet[é] or a retiring character. . . ." (Government's Br. at 30.) This Court lacks any information regarding whether Mrs. King's character and demeanor on the stand may have influenced King's counsel's decision not to move to suppress or object to the computer evidence.

In United States v. McLaughlin, 386 F.3d 547 (3d Cir. 1984), this Court stated that "where a claim of ineffective assistance of counsel is based on attorney incompetence, the lack of a fully developed record often precludes a comprehensive inquiry into the elements of strategy or tactics that may have entered into defense counsel's challenged decision." Id. at 556 (citing Gov't of Virgin Islands v. Zepp, 748 F.2d 125, 133 (3d Cir. 1984)). Here, the record must be developed further in order to ascertain whether counsel's failure to file and litigate a motion to suppress, mid-trial, was a strategic decision.[6]

This Court cannot determine whether counsel's omission was deficient on this record. The record is similarly devoid of the information necessary for this Court to determine whether King was prejudiced by his counsel's omission. We recognize that "the issue of prejudice is also best decided in the first instance in a collateral action rather than on direct review. . . . 'Without additional factual development . . . an appellate court may not be able to ascertain whether the alleged error was prejudicial.'" Thornton, 327

---

[6] Parenthetically, a factual exploration will also unearth whether any motion could have been asserted and still have been deemed timely.

F.3d at 272 (quoting <u>Massaro</u>, 538 U.S. at 505).

In sum, King's ineffective assistance of counsel claim cannot be determined upon direct review without a thorough factual development of the record as to his counsel's alleged ineffectiveness.

## IV. CONCLUSION

<u>Massaro</u> and its progeny require that, absent very narrow circumstances not found here, King's assertion of ineffective assistance of counsel should be heard as part of an application seeking the issuance of a writ of habeas corpus, pursuant to 28 U.S.C. § 2255. The judgment of the District Court shall be affirmed.